**Evelyn M. HIGHLANDER,
Plaintiff-Appellant,**

**v.**

**K.F.C. NATIONAL MANAGEMENT CO.,
d/b/a Zantigo; Heublin Corporation;
Zantigo Mexican Restaurant, Defend-
ants-Appellees.**

**No. 85–3587.**

United States Court of Appeals,
Sixth Circuit.

Argued April 18, 1986.
Decided Nov. 18, 1986.

Paul H. Tobias, Tobias & Kraus, Cincinnati, Ohio, Susan J. Hauck (argued), for plaintiff-appellant.

James K.L. Lawrence, Frost & Jacobs, Cincinnati, Ohio, Samuel H. Elkin (argued), KFC Management Co., Louisville, Ky., for defendants-appellees.

Before KRUPANSKY and WELLFORD, Circuit Judges, and PECK, Senior Circuit Judge.

KRUPANSKY, Circuit Judge.

Plaintiff-appellant Evelyn Highlander (Highlander) appealed from two separate final orders of the district court entering judgment for defendant-appellee Zantigo Mexican Restaurant (Zantigo) in this action initiated pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and Title VII, 42 U.S.C. § 2000e *et seq.*

In September of 1981, Highlander was hired by Zantigo as an assistant manager and met with Pauline Howell (Howell), a Zantigo District Training Instructor, who explained to Highlander the fluctuating work week method of overtime compensation authorized under 29 C.F.R. § 778.114 by referring to a printed form which incorporated detailed examples of the procedure

by which weekly overtime compensation was calculated. She further advised Highlander that her weekly compensation would be determined by applying that method of calculation. Highlander executed a written acknowledgement that she understood the procedure that would be used in computing her weekly compensation.

Highlander was initially assigned to a six week training program which she completed in November 1981. Thereafter, she was designated an assistant manager at the Zantigo outlet located at North Bend and Colerain Streets in Cincinnati, Ohio. Phillip Altieri (Altieri), a North Bend outlet co-manager, was Highlander's immediate supervisor.

On or about February 1, 1982, Ron Kosisko (Kosisko), a Zantigo district training manager who had no supervisory authority over Highlander, approached Highlander and co-employee Ginger Morris (Morris) and commented about their chic company uniforms. Kosisko, who was inebriated at the time, touched Highlander's legs and buttocks. He also touched Highlander's name tag, which was displayed on the tunic over her breast. After patting Morris' buttocks, Kosisko stated that Highlander and Morris must have been wearing "Underalls."

The next day, Highlander and Morris reported the incident to Greg Van Winkle (Van Winkle), the other co-manager at the North Bend establishment. When Van Winkle informed them that he intended to immediately report the incident to management, Highlander stressed that she was not desirous of making an issue of the incident or raising "a big stink about it."

Pursuant to Highlander's request, the company transferred her to a newly opened outlet in Florence, Kentucky which was geographically closer to her home. Altieri had been selected to act as manager at the Florence location. Subsequent to her transfer, Highlander reported the Kosisko incident to Altieri. He immediately notified the area manager Abe Hatem (Hatem) and human resources manager Sandy Allgeier (Allgeier) about the incident. Allgeier promptly conducted an investigation of the accusations.

In an interview with Allgeier, Highlander stated that she did not dislike Kosisko and was not desirous of making an issue of the incident because she did not "think it was that big of a deal." When confronted, Kosisko denied Highlander's charge. Allgeier was unable to confirm Highlander's allegations that Kosisko had touched her breast and concluded that the circumstances of the Kosisko event did not constitute a case of sexual harassment. Nevertheless, the company ordered Kosisko to sign an advisory notice acknowledging his awareness of Zantigo's strict policy against sexual harassment.

In mid-February of 1982, Highlander confronted Altieri and "asked him out to go have a business drink if you want to call it that" to discuss her promotion possibilities. Altieri declined the invitation, but agreed to discuss the subject with Highlander at the Florence business location. Highlander asserted that, during their conversation, Altieri placed his arm around her and stated that if she was interested in becoming a co-manager, "there is a motel across the street." When confronted by the accusation some three months later Altieri categorically denied the charges.

Although Highlander did not herself report the Altieri meeting until May of 1982, her husband mentioned the Altieri statement when he telephoned Hatem in early March to complain about the company's resolution of the Kosisko incident. Hatem explained that it would be inappropriate for him to comment upon Altieri's alleged statement in the absence of an employee complaint, whereupon plaintiff's husband advised Hatem that the statement had apparently been made in jest.

On March 18, 1982, Highlander was returned to the North Bend outlet because she was unable to cope with the high business volume at the Florence site. In mid-May of 1982, Highlander phoned Zantigo's president, Harry Lavo (Lavo), and complained about alleged sexual harassment, failure to receive a promotion, and miscon-

duct of North Bend employees. She also included charges of drug transactions and cash shortages. At a meeting attended by Allgeier, Lavo, Highlander and her husband, Highlander, for the first time, complained about Altieri's misconduct. She also submitted a written memorandum documenting the totality of her charges. In response to Highlander's allegations, Lavo immediately reopened the Kosisko investigation and initiated an inquiry into Altieri's conduct as well as the asserted cash shortages and drug transactions.

Although both Highlander and Kosisko agreed to participate in the revived investigation by submitting to polygraph examinations, Highlander ultimately refused to appear at scheduled appointments. Kosisko was, as a result of the investigation, demoted with an annual salary reduction of $2,000. Hatem also concluded that the evidence was insufficient to justify any disciplinary action against Altieri.

During the first six months of 1982, Highlander was formally disciplined on seven occasions for her unsatisfactory work performance. She received five written reprimands and one suspension. She was terminated on June 17, 1982 for absenteeism and failure to comply with the company's rules and regulations requiring medical verification for her unannounced and frequent absences.

Thereafter, Highlander filed this action wherein she charged sexual harassment pursuant to Title VII, 42 U.S.C. § 2000 *et seq.*, and violations of the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* After a trial on the merits, the district court entered judgment for the defendant on both the Fair Labor Standards Act and Title VII claims. This timely appeal ensued.

On appeal, it was undisputed that Highlander was protected by the provisions of the Fair Labor Standards Act (the "Act"), 29 U.S.C. § 201 *et seq.* Section 7(a)(1) of the Act provides that an employee shall not be employed for more than forty hours in a given week, unless the employee receives compensation for all hours in excess of forty "at a rate not less than one and one half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

Highlander's compensation had been calculated pursuant to the fluctuating work week method of overtime payment authorized under 29 C.F.R. § 778.114. Under the applicable regulations, an employee was paid a fixed weekly salary, regardless of the number of hours worked during a given week. When the employee worked more than forty hours during a week, the employee's salary was supplemented by the payment of an overtime premium which was calculated by dividing the fixed weekly salary by the total number of hours worked during the week to derive the employee's regular hourly rate for that week. Thereafter, the employee was paid an overtime premium of one half of the derived regular hourly rate for the total hours worked in excess of forty during that week, thus ensuring that the employee had been compensated for all hours in excess of forty "at a rate of not less than one and one half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1).

Although the fluctuating work week method of overtime compensation results in lower earnings per hour as the number of hours per week increases, the Act permits its implementation. *See, e.g., Overnight Motor Transportation Co. v. Missel,* 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942). The Department of Labor has, however, promulgated regulations that mandate a clear mutual understanding between the parties that the weekly salary was to be calculated pursuant to the fluctuating work week method. *See* 29 C.F.R. § 778.114.

Specifically, 29 C.F.R. § 778.114(a) provides in relevant part:

Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted

by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay.

■ On appeal, Highlander challenged the district court's conclusion that she had a clear understanding of the manner in which her compensation was calculated. In denying Highlander relief on her Fair Labor Standards Act claim, the district court observed that Highlander had signed and acknowledged the explanatory calculation form indicating that she understood the Fair Labor Standard Act's fluctuating work week method of overtime compensation, that Highlander's claim was based on her *post hoc* self-serving assertion at trial, that Highlander had presented no corroborating evidence whatsoever to support her asserted misunderstanding of the manner in which her rate of pay was calculated, and that her demeanor at trial discounted her credibility as a witness. Accordingly, this court cannot conclude that the district court's finding that Highlander possessed a clear understanding of the procedure that was applied in calculating her wages was clearly erroneous. *See, e.g., Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.").

■ This circuit has recognized that Title VII provides relief for (1) *quid pro quo* sexual harrassment; and (2) sexual harassment which results from a hostile or offensive work environment. *Rabidue v. Osceola Refining Co.*, 805 F.2d 611, 618–19

(6th Cir.1986). *Quid pro quo* sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. In a *quid pro quo* action, the employee bears the burden of proof to support charges that submission to the unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employer's failure to submit to the sexual demands of supervisory employees. *See, Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982); Note, *Sexual Harassment Claims of Abusive Work Environment under Title VII*, 97 Harv.L.Rev. 1449, 1454–55 (1984).

■ To prevail on a *quid pro quo* claim of sexual harassment, a plaintiff must assert and prove (1) that the employee was a member of a protected class; (2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; (3) that the harassment complained of was based on sex; (4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and (5) the existence of respondeat superior liability. *See Henson*, 682 F.2d at 909; *Downes v. Federal Aviation Administration*, 775 F.2d 288, 291–92 (Fed.Cir. 1985). *See also, Hill v. BASF Wyandotte Corp.*, 27 FEP Cases 66, 71 (E.D.Mich. 1981).

■ In a *quid pro quo* sexual harassment action, an employer is held strictly liable for the conduct of supervisory employees having plenary authority over hiring, advancement, dismissal and discipline under the theory of respondeat superior. *Henson*, 682 F.2d at 910; *Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir.1979); *Katz v. Dole*, 709 F.2d 251, 255 n. 6 (4th

Cir.1983). Because Title VII defines "employer" to include "a person engaged in an industry affecting commerce ... and any agent of such a person," knowledge of an employment decision based on impermissible sexual factors is imputed to the employer. *See,* 42 U.S.C. § 2000e(b). *Cf. Anderson v. Methodist Evangelical Hospital, Inc.,* 464 F.2d 723, 725 (6th Cir.1972) ("[W]here a discharge by a person at a lower level of management is racially motivated, Title VII provides the aggrieved employee with a remedy.").

█ Upon reviewing the record as it reflected upon the Altieri episode, this court concludes that the plaintiff failed to prove a cause of action in *quid pro quo* sexual harassment because the alleged harassment was induced by the plaintiff's suggestion that she and Altieri meet in a bar to discuss her opportunities for promotion and because, subsequent to the alleged sexually offensive statements, both Highlander and her husband indicated that Highlander placed no serious implications upon Altieri's conduct. Moreover, the record was totally devoid of any evidence tending to demonstrate that plaintiff was denied a job benefit or suffered a job detriment as a result of her failure to engage in the activity suggested by Altieri. Rather, plaintiff was transferred from the Florence business location to the North Bend outlet because she could not cope with the high volume of business at the Florence address. Highlander, herself, admitted that her performance was adversely affected by her inability to respond to the high business volume at the Florence location and failed to present any evidence whatsoever linking the transfer to Altieri's alleged misconduct. The evidence adduced at trial also disclosed that Altieri did not participate in the decision to terminate plaintiff's employment for her repeated failures to attend work, advise her supervisor of her absences, and provide medical verifications to support the reasons for her frequent absences. Accordingly, this court concludes that the district court did not err in determining that plaintiff did not prevail on her *quid pro quo* sexual harassment claim.

█ Plaintiff's cause of action charging a sexually hostile work environment must be evaluated within the five part test set forth by this circuit in *Rabidue v. Osceola Refining Co.,* 805 F.2d 611 (6th Cir.1986). In *Rabidue,* this circuit stated:

> After having considered the EEOC guidelines and after having canvassed existing legal precedent that has discussed the issue, this court concludes that a plaintiff, to prevail in a Title VII offensive work environment sexual harassment action, must assert and prove that: (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcomed sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment complained of was based upon sex; (4) the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (5) the existence of respondeat superior liability. *See [Meritor Savings v.] Vinson,* [—— U.S. ——] 106 S.Ct. [2399] at 2404–06 [91 L.Ed.2d 49 (1986)]; *Downes,* 775 F.2d at 292–95; *Katz,* 709 F.2d at 254; *Henson,* 682 F.2d at 903–05. *Cf. Erebia v. Chrysler Plastic Products Corp.,* 772 F.2d 1250, 1253–59 (6th Cir.1985) (racial hostile work environment claim); *Torres v. County of Oakland,* 758 F.2d 147, 152 (6th Cir.1985) (national origin hostile work environment claim).

*Rabidue,* at 619–20. The *Rabidue* court also noted that, unlike *quid pro quo* sexual harassment claims which may be predicated upon a single incident of sexual harassment, hostile environment claims are characterized by varied combinations and frequencies of hostile sexual exposures. Thus, in an action alleging a hostile work environment, the plaintiff has the burden of demonstrat-

ing that "injury resulted not from a single isolated or offensive incident, comment, or conduct, but from incidents, comments, or conduct that occurred with some frequency." *Rabidue*, at 620.

 In determining whether the environment to which the plaintiff was exposed while in the employ of the defendant constituted an actionable sexual harassment, this court must, viewing the totality of circumstances surrounding the alleged incidents of sexual harassment, consider whether the charged sexual harrassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff. *Rabidue*, at 620. In passing upon the question, this court is directed to adopt the perspective of a reasonable person's reaction to a similar environment under similar or like circumstances to determine if the defendants' conduct would have interfered with the work performance and would have seriously affected the psychological well-being of that characterized individual. Assuming that the plaintiff satisfied the burden of proving that the defendant's conduct would have interfered with that reasonable individual's work performance and would have affected seriously the psychological well-being of that reasonable employee, the court is thereafter directed to determine if the plaintiff was actually offended by the defendant's conduct and suffered some degree of injury as a result of her exposure to the work environment.

In the case at bar, plaintiff asserted that her injury resulted from her repeated exposures to sexual harassment in the form of (1) sexual advances of Kosisko; (2) Altieri's conduct; and (3) the crude conversation that pervaded the Zantigo restaurants to which she was assigned to work.

 Considering the trial court's reluctance to assign credibility to Highlander as a witness, together with Highlander's reflected attitude that she "didn't think it [the Kosisko incident] was that big of a deal" and she was not desirous of raising "a big stink about it", and her failure to report the Altieri episode for a period of three months, coupled with her husband's characterization of the incident as having been made in jest, prompts this court to conclude that Highlander failed to demonstrate that she was offended in any significant way by the asserted incidents and that the incidents, if in fact they occurred, had the effect of unreasonably interfering with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being. Accordingly, this court concludes that Highlander failed to carry her burden of proof that she was exposed to sexual harassment in the form of a hostile or offensive working environment.

For the reasons stated above, the judgment of the district court is hereby AFFIRMED.