Rose M. BOYD, Plaintiff,

v.

JAMES S. HAYES LIVING HEALTH CARE AGENCY, INC., Memphis Health Center, Inc., and Walter McLaughlin, Defendants.

No. 84–2233 GB.

United States District Court, W.D. Tennessee, W.D.

May 13, 1987.

Wanda Donati, Donald A. Donati, Memphis, Tenn., for plaintiff.

Herman Morris, Jr., Keith C. Kyles, Memphis, Tenn., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIBBONS, District Judge.

Plaintiff here seeks relief for alleged violations of 42 U.S.C. Section 2000e *et seq.* and also asserts state law claims. She contends that she was a victim of sexual harassment that violates Title VII, that her termination was motivated by intentional sex discrimination and retaliation in violation of Title VII, that her termination violated the state anti-discrimination statute, and that defendant McLaughlin committed the state tort of battery.[1] The case was heard by the court in a four-day trial. The court has considered all the evidence and applicable law and makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

Plaintiff Rose M. Boyd, who is female, began working as a commercial insurance clerk with the Memphis Health Center, Inc. (MHC), a multi-service provider of health care to ambulatory patients, in December 1980. In the summer of 1983, plaintiff moved to a position as billing clerk in the home health agency affiliated with MHC. Both MHC and the home health agency, which is here referred to as James S. Hayes Living Health Care Agency, Inc. (Hayes), are defendants in this case, and plaintiff contends that they are a single employer for purposes of Title VII. Shortly after beginning work in the home health agency, plaintiff accompanied defendant Walter McLaughlin, administrator of the agency, to a seminar in Nashville. On the seminar trip two incidents occurred that upset plaintiff. Subsequent to this trip plaintiff contends her working conditions immediately changed drastically. Her position is that McLaughlin harassed her and took unfounded disciplinary action against her. Although she complained to administrators about these problems and about the Nashville trip, no action was taken. Plaintiff was terminated November 4, 1983. She contends that McLaughlin's actions constituted sexual harassment, that her termination was motivated by intentional sex discrimination, and that she was terminated in retaliation for her opposition to an unlawful employment practice. She seeks back pay, reinstatement, front pay, injunctive relief, attorney's fees, and interest. Her state battery claim arises out of the incident on the Nashville trip. Plaintiff

---

1. The court dismissed plaintiff's state law claim for assault at the close of plaintiff's proof.

seeks damages in connection with that claim.

Defendant denies that any actions on the part of McLaughlin constituted sexual harassment or the state tort of battery. Defendants contend that plaintiff was terminated because of poor job performance, not because of sex discrimination or in retaliation for complaining about an unlawful employment practice. Further, Hayes and MHC contend that they are not a single employer for purposes of Title VII. Memphis Health Center's position is thus that it was not plaintiff's employer at the time of the alleged violations. James S. Hayes Living Health Care Agency, Inc.'s position is that it is not an employer within Title VII because it had fewer than fifteen employees during the relevant time period.

A detailed examination of the history of plaintiff's employment by defendants is necessary to resolve the issues presented.

During the two and one-half years plaintiff was employed as a commercial insurance clerk at MHC, her performance was satisfactory, as reflected in her annual evaluations. The last evaluation was done on June 6, 1983, just before plaintiff moved to the home health agency. Plaintiff also received annual raises of 5% a year in this position. Just before her job change she was earning $408 every two weeks; on July 3, 1983, her salary increased to $429 every two weeks. (Ex. 27)

In the summer of 1983 plaintiff became aware of a job opportunity in the home health agency. She saw this as a chance to develop skills in a new area and discussed it with her MHC supervisor and Dr. Theodis Thompson, personnel director at MHC. On July 7, 1983, she wrote a memo to McLaughlin expressing her interest. Both her MHC supervisor and McLaughlin approved the memo that same date. Plaintiff subsequently began work at Hayes as claims processor on July 25, 1983, at a salary of $429 every two weeks. In addition to plaintiff's salary her employer placed $35.69 in an annuity retirement plan for her every two weeks.

Plaintiff had no problems in her new position between July 25, 1983, and the seminar in Nashville. She received training in her new position from her former supervisor at MHC and from Jean Kirby, director of the clinic at Hayes, who had previously done the billing at Hayes. Plaintiff's job duties were set out in a job description (Ex. 4) and included preparing all bills to patients and third-party payors, maintaining records of payments due and made, and processing and review of patient records, including nurses' daily report sheets. There were no criticisms of her performance during this period and her relationship with McLaughlin was cordial. In fact, when defendant McLaughlin hired plaintiff's friend Myrtle Lewis shortly before the seminar, he told Lewis that plaintiff was a nice person and was doing a good job.

Originally, employees other than plaintiff were scheduled to attend the seminar, which was presented by the Tennessee Association for Home Health and Deloitte Haskins and Sells. The seminar topics were principally directed at management and policy-making employees rather than clerical employees like plaintiff. After another employee was unable to attend, however, McLaughlin insisted that plaintiff go. McLaughlin invited plaintiff to ride with him in his car to Nashville, and she agreed.

On the first day of the seminar plaintiff and McLaughlin did some sightseeing together. Before they went sightseeing McLaughlin asked plaintiff if she wanted to relax and put on short pants for their tour, but she declined to do this. Later plaintiff and McLaughlin had dinner together at their hotel. After dinner McLaughlin asked plaintiff if she would visit his room so that they could discuss the meeting. Plaintiff refused, because she wanted to call her boyfriend. Plaintiff went to her own room. Twenty minutes later McLaughlin called plaintiff and again asked her to come to his room. She agreed.

When plaintiff arrived in McLaughlin's room about 10:00 or 10:30 p.m., he poured her a glass of wine for her. The two drank wine and talked for a time. McLaughlin then turned on the television to a pay chan-

nel that was showing a movie containing explicit sexual material. Specifically, the movie showed nude males and females and, according to McLaughlin, concerned incest between a mother and her children. Plaintiff did not want to watch a movie with that subject matter. She got up to leave and told McLaughlin she did not want to watch sex pictures. McLaughlin put his hands on plaintiff's shoulder to stop her and insisted that she stay. Plaintiff refused and left. McLaughlin slammed the door after plaintiff departed. Plaintiff became upset when McLaughlin turned on the sex movie and put his hand on her. She considered this to be offensive and a sexual advance.

After the seminar was over the next day plaintiff and McLaughlin returned to Memphis in McLaughlin's car. Plaintiff asked McLaughlin if he had anything that she could read. McLaughlin got magazines with explicit sexual material from the trunk of his car and gave them to plaintiff. Plaintiff refused to read the magazines. She told McLaughlin to let his wife or Shasta (a fellow employee at Hayes) read them. McLaughlin replied that he "didn't have to ask Shasta, she'll do it anyway." Plaintiff was also upset by this incident.

McLaughlin does not deny that these two incidents occurred substantially as related by plaintiff, but he testified that they were not intended to be a sexual advance. The court has resolved most credibility issues on minor details of the incidents in plaintiff's favor.

When plaintiff and McLaughlin arrived in Memphis, he insisted on taking plaintiff's luggage to her third floor apartment. McLaughlin wanted to come in to discuss what had happened in Nashville, but plaintiff refused.

After the trip to Nashville, McLaughlin's attitude toward plaintiff changed immediately. He would not speak to plaintiff. He increased her work load. He told Shasta Sharp, a secretary who had originally been directed to help plaintiff type her claim forms, not to help plaintiff any more. All these changes occurred within a week after the trip to Nashville.

Among the changes in plaintiff's job duties after the Nashville trip was a requirement that plaintiff enter the daily reports from all the nurses into a computer. The reason given for this change was that Hayes was converting to computer billing on a weekly basis in order to improve its cash flow. There was no computer on the Hayes premises, and plaintiff had to go to MHC to use the computer. Often all the terminals were in use and plaintiff had to wait for a computer. Plaintiff had to input around 45 to 50 reports per day. While inputting each report took only a short time, the initial entering of the basic information on each patient took five to ten minutes. Thus putting this computer system into operation required a substantial amount of plaintiff's time. Plaintiff testified that doing the computer work properly would have required about four hours per day, but that she was able to devote only one and a half hours per day to this task. Plaintiff's other duties at this time included productivity reports on patients, keeping a file on new admissions and discharges, reviewing remittance advices, and making follow-up phone calls to Medicare and Medicaid on rejected claims.

A further manifestation of McLaughlin's changed attitude toward plaintiff was his constant criticism of her job performance. Prior to the Nashville trip McLaughlin had never criticized plaintiff's performance.

Other employees noticed McLaughlin's changed attitude and the difference in plaintiff's job duties after the Nashville trip. Jean Kirby, a highly credible witness, said "everything changed" after the trip and McLaughlin "was just always on her [plaintiff's] back." Kirby corroborated plaintiff's testimony about her difficulties in putting information into the computer. Kirby also heard that McLaughlin intended to fire plaintiff for refusing to cooperate with him in Nashville. She relayed this information to MHC medical director Dr. Wesley Jones and another MHC official in late September or early October and also to McLaughlin. McLaughlin denied that he intended to fire plaintiff. Myrtle Lewis also noticed McLaughlin's changed attitude

and criticism of plaintiff. She said he accused plaintiff of not doing her job, of being sick and of needing a psychiatrist. Plaintiff, Sharp, Kirby and Lewis all agreed that McLaughlin had told Sharp not to help plaintiff after the Nashville trip.

During this same time period McLaughlin told Sharp that plaintiff and Kirby would be gone in a certain period of time. Sharp did not recall the length of time given.

Shortly after the changes occurred plaintiff complained to Jones about her job situation. She told Jones that McLaughlin had changed since the Nashville trip. She advised Jones of the changes in her job duties and McLaughlin's constant criticism of her performance. She told Jones that she believed that these changes had occurred because of her rejection of McLaughlin's sexual advances in Nashville. Plaintiff also talked with Thompson about her job situation and told him the same thing she had told Jones. Thompson responded to plaintiff that she had a "way of flirting with men anyway." There is no evidence in the record that would provide a basis for such a statement by Thompson. Further, it is uncontroverted that plaintiff complained to Jones and Thompson and that Thompson gave this response. No action was taken by Jones or Thompson to investigate plaintiff's allegations.

On October 7, 1983, McLaughlin wrote a memorandum to plaintiff documenting a counselling session (Ex. 9). The memo mentioned that the discussion had centered on problems in entering information into the computer, errors due to carelessness, and the importance of timely submission of work. The memo also noted that the particulars of placing the necessary data into the computer terminal were discussed at length.

On October 11, 1983, plaintiff received a second memorandum (Ex. 10). The memo indicated that plaintiff had failed to complete her billings and weekly productivity reports in a timely manner. The memo advised plaintiff that these were "serious breaches of duties" and indicated that, if the problems were not corrected, plaintiff would be terminated.

There is conflicting proof about whether plaintiff was performing her job satisfactorily at this time and throughout the period between the seminar and plaintiff's termination. Plaintiff's position is that she performed her normal work satisfactorily and did her best at an impossible task in working with the computer. Defendant contends that plaintiff made many billing errors, was late with reports and did not work as quickly as she should have in entering information into the computer. Having considered all the proof on this issue, particularly the testimony of plaintiff, Kirby, Tametta Grimes and defendant McLaughlin, the court finds plaintiff's position to be the more credible one. Plaintiff did perform satisfactorily and any shortcomings on her part were attributable to McLaughlin's imposition of unrealistic duties upon her.

On October 12, 1983, plaintiff received a third memorandum from McLaughlin. This memo complained that plaintiff had worked overtime without approval. The memo indicated that plaintiff had worked an hour and a half past the usual closing time on October 4 and, as a result, was supposed to have taken off an hour and a half early on October 7. According to the memo, plaintiff failed to leave work early on October 7. In addition, the memorandum indicated that plaintiff left thirty minutes early without approval on election day, October 6. Despite this memorandum, the court finds, in accordance with plaintiff's testimony, that she had permission to work overtime and permission to leave early on election day. Plaintiff complained to McLaughlin about having received these memoranda.

On October 12 plaintiff left for a two-week vacation. She was scheduled to return on October 26, but missed her flight. As a result she returned to work a day late. She did not call the office to explain her absence, but rather called a co-worker and friend, Myrtle Lewis, and asked her to inform McLaughlin that she would not be at work on October 26. McLaughlin was

notified of the reason for plaintiff's absence sometime on October 26.

At some point subsequent to the Nashville trip McLaughlin told Kirby not to help plaintiff with her work. When Kirby did some of plaintiff's work while plaintiff was on vacation, McLaughlin attempted to suspend her. Instead of accepting the suspension, Kirby resigned.[2]

On October 27 plaintiff received still another memorandum from McLaughlin. This memorandum dealt with plaintiff's failure to return to work on October 26 and failure to call the office to explain her absence. The memorandum also referred to plaintiff's prior work performance. The memorandum advised plaintiff that she was being placed on a thirty-day period of concern. The memo warned that, if plaintiff's performance did not improve during this period, she would be terminated. It referred to plaintiff as a probationary employee. McLaughlin consulted with Thompson about this memo.

After receiving the October 27 memorandum, plaintiff again complained to Jones about her treatment. He took no action as a result of her complaint.

Certainly plaintiff should have called McLaughlin concerning her problem with her flight. Given the fact that she did call a co-worker and her satisfactory work performance, however, the discipline imposed by the October 27 memo is disproportionate to the offense.

The October 27 memo was the first notice plaintiff had that anyone considered her a probationary employee. Before assuming her new job she was not given notice that she was a probationary employee in her new position. Hayes utilized the personnel policy manual of MHC throughout plaintiff's employment. The manual provided that a full-time non-probationary employee who transfers laterally does not become a probationary employee by virtue of the transfer; if the move is a promotion to a higher classification, the employee is required to serve a probationary period. Plaintiff's transfer to Hayes was a lateral one. Defendant's personnel records (Exs. 27 & 28) indicate that she moved from a Grade 2, Step 6 position to another Grade 2, Step 6 position. Her salary remained the same.

It seems unlikely that defendant actually considered plaintiff a probationary employee at the time of her transfer. The documents received by plaintiff (Exs. 2 & 3) at the time of her transfer and certain of the documents from plaintiff's Hayes personnel file (Ex. 21) give no indication of probationary status. Other copies of the same documents furnished to plaintiff that were produced by defendant during discovery (Ex. 17) and other records of defendant (Ex. 28 & certain documents in Ex. 21) indicate that plaintiff was given probationary status upon her transfer. One of defendant's documents (Ex. 28), indicating probationary status in the new position, includes a signature date prior to the time plaintiff ever requested transfer. Although probationary employees did not receive vacation pay under the MHC manual, plaintiff took a paid vacation in October, 1983, without any objection or comment from defendants. Whatever defendants' position about plaintiff's probationary status at the time of her transfer, however, she was advised by at least October 27, 1983, that defendant McLaughlin considered her a probationary employee.

Late in October an incident occurred that upset plaintiff. During a staff meeting McLaughlin indicated that funds were not being received by the agency because plaintiff was not entering information into the computer fast enough. Plaintiff responded to McLaughlin that this statement was not

---

**2.** Kirby and McLaughlin had other conflicts. They disagreed about the number of patients the nurses should see and about free patients. There is evidence too that Kirby resented McLaughlin's assumption of a supervisory role over her; this was justified to some extent by MHC officials' prior assurances to Kirby that McLaughlin would not have supervisory author- ity over her. Finally, McLaughlin apparently blamed Kirby for errors in entering data into the computer that caused a breakdown of the MHC computer system. These errors occurred when Kirby was helping plaintiff with her work. McLaughlin and Kirby obviously disliked each other. Despite their problems, Kirby was an excellent and credible witness.

true and that he was saying this because she would not go to bed with him in Nashville. McLaughlin denied plaintiff's accusation.

On November 2, 1983, an incident occurred involving a lost key. Plaintiff could not find her file cabinet key and became very upset. As a result of this incident McLaughlin placed plaintiff on administrative leave without pay for one-half day. While plaintiff was somewhat disruptive on this occasion, the accounts of other witnesses indicate that McLaughlin exaggerated her behavior in his testimony.

Plaintiff did not file a grievance about any of the disciplinary actions, memoranda or McLaughlin's conduct. Because she had already complained to Jones and Thompson without results, she felt this would be futile.

On November 4, 1983, the day of Hayes' grand opening and open house, plaintiff was terminated. On that day plaintiff requested a meeting with McLaughlin to complain about her suspension of November 2. She and McLaughlin met. Tametta Grimes, Hayes' director of nursing, also attended the meeting. McLaughlin contends that plaintiff was confrontational at this meeting and demanded that he pay her or fire her. Grimes did not corroborate this testimony and plaintiff denied it. Later that day plaintiff spoke with Jones. According to witness Myrtle Lewis, when McLaughlin saw plaintiff and Jones talking together, he went to his office and came out with a folder and some paper. He went directly to the main building of Memphis Health Center. McLaughlin conceded that he consulted with MHC executive director Eric Taylor before terminating plaintiff. Subsequent to this time plaintiff was terminated by McLaughlin in the presence of Tametta Grimes.

After her termination plaintiff wrote to MHC executive director Eric Taylor. She sent copies of the memorandum to Jones, Thompson and Don Windbush, chairman of the board of MHC. In the memorandum plaintiff alleged that McLaughlin had sexually harassed her and had treated her unfairly. On November 22, 1983, Thompson responded to plaintiff's letter, rejecting her request for investigation because she was a probationary employee and because she had violated the grievance procedure set forth in the MHC personnel manual by forwarding her request to the chairman of the board. Additionally, he refused to provide her a hearing because she had not requested a hearing within two days of her dismissal.

Plaintiff was replaced by a male Claude Douglas. When Douglas began work, McLaughlin told Sharp to assist him and to type billing forms for him. Although Douglas had computer experience, he was never required to use the computer. The conversion to computer billing was never completed. Nor was a change from monthly to weekly billing accomplished. McLaughlin explained this by saying that a decision was made to abandon weekly computer billing and to attempt other means of increasing cash flow.

McLaughlin made advances toward at least one other female employee, Shasta Sharp. Sharp cited three specific incidents. On one occasion McLaughlin had two tickets for a show and wanted Sharp to attend with him. McLaughlin told Sharp to tell her boyfriend whatever it took in order for Sharp and McLaughlin to attend together. Despite Grimes' advice to Sharp to go with McLaughlin, Sharp refused. On other occasions McLaughlin called Sharp into his office. When she arrived, he would lean back in his chair and, in her words, expose his "print." Finally, McLaughlin took Sharp to have a drink after work at a hotel. He told her that he had a room and asked her to accompany him to the room. Sharp did not feel that any adverse employment action was taken against her as a result of her refusal of McLaughlin's advances.

Sharp further testified that in a conversation with Thompson in Thompson's office, "his eyes swerved to my breast, and he said that he sure would like to suck those." This testimony was not controverted by defendant.

After plaintiff went to the EEOC and Lewis had spoken with the EEOC on plaintiff's behalf, McLaughlin was cold to Lew-

is. Lewis complained to Thompson and Jones about her treatment.

MHC and Hayes became separate corporate entities in July 1983. MHC had approximately sixty employees during all times pertinent to this lawsuit; Hayes had at least eight employees at some point during plaintiff's employment, but always had fewer than fifteen employees. MHC organized Hayes so that money obtained by Hayes would not be restricted by the regulations of the United States Department of Health and Human Services. MHC provided the money to start Hayes. Hayes' incorporators were MCH's board chairman and corporate counsel. The MHC board selected the Hayes board, and MHC officials served on the Hayes board. MHC's executive director was chairman of the board of Hayes. MHC and Hayes had separate offices and were located in different buildings in the same group of buildings. Thompson, MHC's personnel director, had a substantial role in hiring at Hayes. MHC kept Hayes' personnel files. During plaintiff's employment all employees at Hayes, including plaintiff, were paid by MHC checks. MHC and Hayes had the same employee insurance plan. All employee benefits were paid by MHC. During this same time period MHC paid Hayes' bills and was responsible for its debts. Until December 13, 1983, MHC and Hayes operated under an oral agreement. Around March 1984 Hayes started doing its own payroll. During late 1983 and early 1984 officials of MHC were trying to make Hayes and MHC function separately. According to Warren Peterson, senior vice-president for financial management for Hayes, MHC and Hayes were functioning as a single entity in the areas of payroll, health care benefits, accounting and personnel services in January 1984. The functions relating to delivery of services were separate, however. Until mid–1984 Hayes used MHC's personnel manual. Despite the efforts to separate the entities, Lewis' June 29, 1984, separation notice listed MHC as her employer. Several Hayes employees, including plaintiff, thought of Hayes and MHC as one and considered MHC their employer. At the time of trial the same person served as Hayes administrator and MHC executive director.

Plaintiff has earned $9,134 since being terminated. She has applied unsuccessfully for employment with various companies, including Blue Cross–Blue Shield, Provident Insurance Company, E.H. Crump Company, Federal Express, Marketing Vibrations, and Memphis Light, Gas and Water.

## II. CONCLUSIONS OF LAW AND LEGAL ANALYSIS

### A. *Jurisdiction.*

Both parties agree that the court has jurisdiction of this case under 42 U.S.C. § 2000e *et seq.*

Defendants Hayes and MHC constitute a single employer under Title VII. The test articulated in *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir.1983), governs the determination of whether these defendants constitute a single employer. The Court of Appeals in *Armbruster* said:

> [T]he most important requirement is that there be sufficient indicia of an interrelationship between the immediate corporate employer and the affiliated corporation to justify the belief on the part of an aggrieved employee that the affiliated corporation is jointly responsible for the acts of the immediate employer. When such a degree of interrelatedness is present we consider the departure from the single 'normal' separate existence between entities an adequate reason to view the subsidiary's conduct as that of both. *Id.* at 1337.

In testing the degree of interrelationship, the court utilized a four-part test which requires examination of the degree of 1) interrelated operations, 2) common management, 3) centralized control of labor relations, and 4) common ownership. *Id.* The court noted that the presence of any single factor is not conclusive and that all need not be present in all cases. *Id.* at 1337–38.

■ Application of the *Armbruster* test to the facts of the present case plainly mandates a finding that Hayes and MHC

were a single employer. While there is no proof in this record as to who owned the stock in these corporations, the ownership relationship between the two is obvious. MHC organized Hayes for specific purposes of its own. MHC provided start-up funds for Hayes and Hayes was incorporated by MHC's executive director and counsel.

Common management is present as well. The MHC board selects the Hayes board. The Hayes board chairman was the executive director of MHC.

In the area of operations the two entities functioned as one for the most part during the period of plaintiff's employment. MHC provided all fiscal accounting and payroll services for Hayes. All payroll checks and employment benefits were provided by MHC to Hayes employees. MHC provided Hayes with funds and was responsible for its debts. The only area in which the entities functioned separately was in delivery of services.

Common control of labor relations policy existed as well. Not only were Hayes employees paid and furnished benefits by MHC, they functioned under the MHC personnel manual. MHC maintained Hayes' personnel files. Eric Taylor was consulted before plaintiff was terminated and Thompson was consulted before her suspension. Thompson played a substantial role in the hiring of Hayes employees.

Because MHC and Hayes are a single employer, the jurisdictional requirement of 42 U.S.C. § 2000e(b) is met.

### B. *Sexual Harassment.*

Plaintiff first asserts that she was a victim of sexual harassment in violation of Title VII. Sexual harassment is a form of sex discrimination prohibited by Title VII. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); 29 C.F.R. § 1604.11. In *Vinson* the Supreme Court, while dealing primarily with hostile environment sexual harass-

ment claims, recognized that liability can be based on the grant or denial of economic benefit linked to "[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature."[3] 106 S.Ct. at 2405. The court cited with approval the EEOC guidelines defining sexual harassment and outlining the possible bases for liability for conduct constituting sexual harassment. *Id.; see* 29 C.F.R. § 1604.11.

Plaintiff in this case makes no claim based on a *hostile work environment* constituting sexual harassment. Rather, her *quid pro quo* claim is that McLaughlin made a sexual advance or engaged in other conduct of a sexual nature toward her and that her rejection of the advance or conduct was the basis for her subsequent discipline and termination. The EEOC guidelines include the following as a violation of Title VII: 1) submission to the advance or conduct is implicitly or explicitly a term or condition of the individual's employment and 2) the submission to or rejection of the advance or conduct is used for the basis of an employment decision. 29 C.F.R. § 1604.11(a)(1) and (2). Thus, the conduct alleged, if proven, would constitute a violation of Title VII. *See Vinson,* 106 S.Ct. at 2405; *Henson v. City of Dundee,* 682 F.2d 897, 908–09 (11th Cir.1983); *Bundy v. Jackson,* 641 F.2d 934 (D.C.Cir.1981); *Fisher v. Flynn,* 598 F.2d 663, 665 (1st Cir. 1979).

 To establish a *prima facie* case of sexual harassment under a *quid pro quo* theory, plaintiff must establih that (1) she belongs to a protected group; (2) she was subjected to unwelcome sex harassment; (3) the harassment was based on sex; and (4) the employee's submission to the unwelcome harassment was an express or implied condition for receiving job benefits or the employee's refusal to submit resulted in a tangible job detriment. *See Highlander v. K.F.C. National Management Co.,* 805 F.2d 644, 648 (6th Cir.1986);[4] *Henson,*

---

**3.** Cases based on this theory of liability are known as *quid pro quo* cases. 106 S.Ct. at 2405.

**4.** *Highlander* lists *respondeat superior* liability as a fifth element of plaintiff's case. 805 F.2d at 648. This element is discussed *infra* at 1166. In listing these elements, *Highlander* is not item-

682 F.2d at 909; *Bundy*, 641 F.2d at 951–53.

■ Plaintiff is obviously a member of a protected group. Defendants, however, contend that the other criteria are not met. Specifically, they contend that plaintiff was not subjected to a sexual advance, much less an unwelcome one. They also contend that her refusal of the alleged harassment had no effect on her employment.

Defendants correctly assert that McLaughlin did not explicitly issue an invitation to plaintiff to enter a sexual relationship with him, nor did he force one upon her. McLaughlin's conduct was more subtle. Despite this, McLaughlin's conduct, whether it is characterized as an advance or "other verbal or physical conduct of a sexual nature," does fall within the guidelines' definition of sexual harassment. The overall circumstances of both Nashville incidents—the insistence on plaintiff's coming to his hotel room, the wine, the subject matter of the movie and the magazines, the effort to restrain plaintiff's departure, the slammed door and other factors—demonstrate that McLaughlin's conduct was sexual in nature.

In addition, McLaughlin's conduct was unwelcome. While plaintiff was voluntarily in McLaughlin's room and rode home with him voluntarily, the voluntariness of plaintiff's conduct does not determine whether defendant's conduct was unwelcome. *Vinson*, 106 S.Ct. at 2406. Plaintiff did not solicit or incite defendant's conduct in any way; she found the sexually explicit movie and magazines and McLaughlin's touching of her undesirable and offensive. *See Henson*, 682 F.2d at 903.

■ McLaughlin's harassment of plaintiff was based on her sex. No men were treated similarly; plaintiff would not have been treated in this way but for her sex. Finally, ample evidence exists that plaintiff's refusal to submit resulted in her discipline and discharge. Plaintiff has established a *prima facie* case of sexual harassment that violates Title VII.

In response to the *prima facie* case defendants have articulated a legitimate nondiscriminatory reason for the disciplining of plaintiff and her termination. Principally through documentary proof and McLaughlin's testimony, they have presented evidence that plaintiff performed her job poorly by making errors in billing, completing work untimely, violating rules about overtime and vacation and creating disruption in the workplace.

The ultimate question then is whether plaintiff has met her burden of proving by a preponderance of the evidence that defendants' articulated reason is pretextual and that her rejection of McLaughlin's advance or conduct resulted in her termination. Plaintiff has met that burden.

The proof establishes that McLaughlin was annoyed and upset by plaintiff's failure to remain in his room to view the sexually explicit movie. He demonstrated his feelings by slamming the door as she left. McLaughlin's remarks on the car trip home when plaintiff refused to read the sexually explicit magazines revealed his irritation over that incident. When they arrived in Memphis, McLaughlin's attitude was further shown by his efforts to come into plaintiff's apartment to discuss the Nashville incidents.

The most convincing proof that plaintiff's job problems and termination resulted from her actions on the Nashville trip involves the abrupt change in McLaughlin's attitude after the trip. Plaintiff had been employed by MHC for two and a half years at the time she began working under McLaughlin's supervision at Hayes. She had performed her work satisfactorily with absolutely no problems. After she began work at Hayes in July 1983 she had no problems, and McLaughlin found no fault with her work at this time. After the seminar trip in September 1983, however, McLaughlin's attitude changed immediately. He criticized plaintiff's performance,

izing the requirements for a *prima facie* case. Rather, the court is listing the elements plaintiff must prove in order to prevail. The list seems adaptable to the *prima facie* case analysis, however.

would not speak to her, increased her job duties, and took away her secretarial assistance. The proof is clear on each of these points. Plaintiff's testimony is supported by that of several other witnesses. With respect to the increased job duties, there is substantial question whether Hayes ever intended to go to weekly computer billing or whether McLaughlin was simply retaliating against plaintiff. Plaintiff's male replacement was not required to input information into the computer, and the conversion to weekly computer billing was abandoned as soon as plaintiff was discharged. Assuming that McLaughlin at some point did intend to make this billing change, the proof is clear that he imposed an unreasonable burden on plaintiff in making the change. At a time when her secretarial help had been taken away, she was required to do work that required hours of her time on a computer that was usually unavailable for her use. When she was unable to do all that McLaughlin had assigned to her, she was disciplined for this failure.

The preponderance of the evidence establishes that in changing plaintiff's job duties McLaughlin deliberately attempted to create a situation in which plaintiff could not succeed so that he would have a basis for criticism of her work. Despite McLaughlin's motives and the conflicting proof about plaintiff's work performance, however, the weight of the evidence is that plaintiff's overall performance continued to be satisfactory despite her inability to handle the computer entries to McLaughlin's satisfaction. Defendant's evidence to the contrary consisted almost exclusively of McLaughlin and his memoranda; plaintiff and her witnesses were much more credible than defendant's proof on this point. Significantly, all McLaughlin's memoranda were written after Kirby had informed McLaughlin, Jones and Thompson that she had heard McLaughlin intended to fire plaintiff for refusing to cooperate with him in Nashville and apparently after plaintiff's initial complaints to Jones and Thompson about McLaughlin's conduct.

McLaughlin was aware that plaintiff attributed his treatment of her to her refusal to submit to his advances in Nashville. Even if neither Thompson nor Jones relayed this information to him, Jean Kirby told him shortly after the September trip. Kirby also complained to MHC administrators about McLaughlin's treatment of plaintiff. About this time McLaughlin told Sharp that both plaintiff and Kirby would be gone within a certain period of time. Thus the record is clear that within a short time after the Nashville trip McLaughlin had decided to terminate plaintiff. This proof strongly supports the conclusion that McLaughlin attempted to create a basis for plaintiff's termination.

Given his decision to terminate plaintiff, McLaughlin attempted to reinforce his position by treating plaintiff as a probationary employee. The record supports a finding that this classification was made some time after the Nashville trip, although it is impossible to determine who created or changed the pre-September documents that do show plaintiff as a probationary employee. It is clear, however, that the documents plaintiff received in July and certain other personnel documents do not show plaintiff as a probationary employee. She was not treated as a probationary employee when she left on a paid vacation, to which a probationary employee would not have been entitled, on October 12. Further, plaintiff's classification as a probationary employee was incorrect. MHC and Hayes operated as a single employer, and Hayes used the MHC personnel manual. Under that manual plaintiff made a lateral transfer and was not a probationary employee.

Although the proof does establish that plaintiff continued to do her job satisfactorily, it also indicates that plaintiff was somewhat emotional at work on two occasions—the staff meeting when McLaughlin publicly stated the agency was not receiving reimbursement because of her work and the key incident. Her conduct during the key incident was not sufficiently egregious to warrant the discipline she received. Plaintiff also failed to give proper notification to McLaughlin of her late return from vacation. This omission did not

warrant the discipline administered or plaintiff's termination.

Thus, plaintiff has established by a preponderance of the evidence that defendant McLaughlin subjected her to unwelcome sexual harassment based on her sex and that her refusal to submit to it resulted in her disciplining and ultimate termination. Because defendant McLaughlin was an agent of his employer, he is an employer under Title VII, *see* 42 U.S.C. § 2000e(b), and may thus be liable for his actions. McLaughlin was a supervisory employee with authority to make employment decisions about discipline and termination, and therefore his employer is liable for his conduct. *See Vinson*, 106 S.Ct. at 2407–08; *Highlander*, 805 F.2d at 648. MHC and Hayes are a single employer; therefore they are both liable. The court therefore finds that all three defendants have violated Title VII and are liable to plaintiff on her sexual harassment claim.

## C. *Sex Discrimination Claim.*

Plaintiff also asserts that intentional discrimination based on sex was a but for cause of her termination.

█ The rules concerning order and allocation of proof outlined in *McDonnell–Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), apply to this disparate treatment claim of intentional sex-based discrimination. Applying these rules to the instant case, plaintiff has established a *prima facie* case. As a member of the protected class, plaintiff was qualified for her job, performed it, and was terminated. The job she had held was filled by a man, Claude Douglas. Defendant has articulated a legitimate nondiscriminatory reason for plaintiff's discharge—poor job performance—and has presented evidence in support of that reason.

Finally, plaintiff has carried her burden of proving by a preponderance of the evidence that defendant's reason for her discharge was pretextual and that intentional sex-based discrimination motivated her discharge. In making this conclusion, much of the proof pertinent to the sexual harassment claim is relevant here. In fact, because a violation of Title VII on a sexual harassment theory requires a finding that the action taken toward plaintiff was based on her sex, the two theories overlap substantially. Nevertheless, certain facts are particularly important in finding that plaintiff is entitled to a recovery on this theory. Plaintiff's male replacement was never required to input data into the computer. The conversion to weekly computer billing was abandoned as soon as plaintiff left and Douglas was hired. Further, when Douglas took the position plaintiff had held, Sharp was instructed to assist him with his typing. Based on these facts and those stated earlier in this opinion, the court finds that plaintiff's discharge was motivated by intentional sex-based discrimination. All three defendants are liable under Title VII.

## D. *Retaliation Claim.*

█ Plaintiff also claims that she was discharged in retaliation for her opposition to an unlawful employment practice in violation of 42 U.S.C. § 2000e–3(a).

In order to establish a *prima facie* case under 42 U.S.C. § 2000e–3(a), plaintiff must demonstrate (1) that she is engaged in protected activity; (2) that the employer knew of this protected activity; (3) that she was subsequently discharged or subjected to other damages; and (4) that the employer had a retaliatory motive or that the timing of the action was such as to allow an inference of retaliation to arise. *Sutton v. National Distiller Prod. Co.*, 445 F.Supp. 1319, 1325–26 (S.D. Ohio 1978), *aff'd*, 628 F.2d 936 (6th Cir.1980); *EEOC v. St. Joseph Paper Co.*, 557 F.Supp. 435, 438–39 (W.D.Tenn.1983). Clearly plaintiff has established a *prima facie* case of retaliation. She engaged in protected activity by refusing McLaughlin's conduct. She expressed her opposition to McLaughlin, Jones and Thompson. Thus, the employer knew of her activity. Since plaintiff was discharged within a few weeks of her initial opposition and a few days of her public

denouncement of McLaughlin at the staff meeting, an inference of retaliation arises.

Once a *prima facie* case is established, defendant has the burden under *Burdine* to articulate a legitimate, nondiscriminatory reason for the discharge. Defendant has met this burden by presenting evidence of plaintiff's poor job performance.

Plaintiff has established by a preponderance of the evidence that her discharge was motivated by retaliation against her for complaining about McLaughlin's treatment of her. The facts supporting the retaliation claim overlap with those supporting plaintiff's other claims. For the same reasons discussed above, particularly plaintiff's protest to McLaughlin, Jones and Thompson about McLaughlin's behavior and her public protest of it at staff meeting, the court finds that retaliation was a but for reason for plaintiff's discharge. Defendant's asserted legitimate nondiscriminatory reason is pretextual.

▪ Two other issues with respect to the retaliation claim require analysis. First, it is in no way inconsistent to find that plaintiff was terminated because she refused McLaughlin's advances and because she complained about his conduct. Title VII requires no finding that a particular motive was the sole cause of an employer's action; the requirement is simply that the motive predominated over the legitimate reason offered by defendant or was a "but for" cause of defendant's action. *See McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2579 n. 10, 49 L.Ed.2d 493 (1976). Certainly more than one such unlawful motive can predominate over a legitimate reason and be a "but for" cause of an employer's action in a particular situation. Second, even if defendant correctly asserts that plaintiff cannot recover on her sexual harassment claim because McLaughlin's conduct did not fall within the guidelines' definition of actionable conduct, plaintiff is still entitled to recover on her retaliation claim. This court agrees with those courts holding that opposed activity need not actually violate Title VII. It is sufficient if plaintiff acts on a reasonable belief that defendant has committed an unlawful employment practice. *Rucker v. Higher Educ. Aids Bd.*, 669 F.2d 1179, 1182 (7th Cir.1982); *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1019–20 (D.C.Cir. 1981); *Sias v. City Demonstration Agency*, 588 F.2d 692, 695–96 (9th Cir.1978); *Croushorn v. Board of Trustees of Univ. of Tenn.*, 518 F.Supp. 9, 25 (M.D.Tenn. 1980). Plaintiff in this case was acting on such a good faith and reasonable belief in protesting defendant's conduct toward her.

### E. *State Law Claims.*

Plaintiff also asserts a state law claim under the Tennessee anti-discrimination statute, T.C.A. § 4–21–101 *et seq.* Since this court has found a violation of Title VII, and Title VII and the state statute permit the same relief, *see Graham v. Holiday Inns, Inc.*, Civ. No. 85–2431, Order of Partial Dismissal (W.D.Tenn. March 31, 1986) [Available on WESTLAW, 1986 WL 15783], there is no reason to discuss plaintiff's claim under the state statute.[5]

Plaintiff further asserts the state tort claim of battery. While McLaughlin's touching of plaintiff was intentional and may have been mildly offensive to her, *see Moffitt v. United States*, 430 F.Supp. 34, 37–38 (E.D.Tenn.1976); *Kite v. Hamblen*, 192 Tenn. 643, 646, 241 S.W.2d 601, 603 (1951); Restatement (Second) of Torts § 13, plaintiff sustained no compensable damage as a result of this touching. There is no proof in the record to support a finding of mental or physical harm as a result of this touching, standing alone. Therefore, judgment shall be entered for defendants on this claim.

### F. *Relief.*

Plaintiff is entitled to back pay. *See Rasimas v. Michigan Dept. of Mental*

---

5. The court notes that the state jurisdictional requirement with respect to number of employees differs from Title VII's fifteen employee requirement. T.C.A. § 4–21–102(4). Because the state statute asserts jurisdiction over an employer with eight employees, it would apply to Hayes even if Hayes and MHC are not a single employer.

*Health,* 714 F.2d 614, 626 (6th Cir.1983). She testified that she was making $429 every other week. She received a 5% annual increase, according to her testimony and the personnel manual. Based on the proof at trial, plaintiff's back pay is thus calculated as follows:

| | |
|---|---|
| November 4, 1983—July 24, 1983 (16.2 pay periods × $429.00 per pay period) | $ 6,949.80 |
| July 25, 1984—July 24, 1985 (26 pay periods × $450.45 per pay period) | 11,711.70 |
| July 26, 1985—May 23, 1986 (22 pay periods × $472.97 per pay period) | 10,405.34 |
| TOTAL | $29,066.84 |

Plaintiff made all reasonable efforts to mitigate and her earnings during the time period for which her back pay is calculated were $9,134.00. This figure must be subtracted from the back pay award. Plaintiff's back pay award is thus $19,932.84.

Although plaintiff received unemployment benefits after November 4, 1983, the back pay award is not reduced by these amounts. *See Rasimas,* 714 F.2d at 627. Nor is it reduced by income and social security tax that would have been deducted from plaintiff's wages but for her unlawful termination. *Id.*

Plaintiff is also entitled to be made whole by receiving the amount that defendant would have deposited into the group annuity on her behalf during the time for which the back pay is calculated plus interest on that amount. *See id.* at 626. The employer contributions total $1,453.34. Plaintiff is also entitled to $290.66, the amount these funds would have earned if they had been paid into the annuity promptly.

In this case reinstatement is in all likelihood appropriate. *See Shore v. Federal Express,* 777 F.2d 1155 (6th Cir.1985). Because, however, this court needs to discuss with the parties the current availability of a position, the court will withhold ruling on this issue until a conference with the parties is held. Similarly, the court will withhold ruling on the issue of front pay pending reinstatement until after this confer-

ence. The conference is scheduled for Friday, May 22, 1987, at 11:00 a.m.

Plaintiff asserts that this court should also order injunctive relief and require defendants to present a plan for prevention of future sexual harassment. Given the uncontroverted testimony at trial that high officials of defendants were notified of McLaughlin's conduct and took no steps to investigate and correct it *and* the further uncontroverted testimony concerning the conduct of MHC's personnel director Thompson, the court agrees that such relief is appropriate. Accordingly, defendant is ordered to present to the court within twenty (20) days of this order a plan outlining steps it will take to prevent sexual harassment from occurring, including, "affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under Title VII and developing methods to sensitize all concerned." 29 C.F.R. § 1604.11(g).

Since plaintiff was the prevailing party, she is entitled to reasonable attorney's fees and expenses for bringing this action. Accordingly, counsel for plaintiff is instructed to submit within ten (10) days evidence in support of an award of reasonable attorney fees and expenses for the representation of plaintiff. Defendants will have ten (10) days to respond to plaintiff's submission.

The court has determined that no award of pre-judgment interest is appropriate here.

Judgment will be entered for plaintiff after orders dealing with further relief and attorneys fees are entered.

IT IS SO ORDERED.