**Melody PERKINS, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. 87–0048–CV–W–9.**

United States District Court, W.D. Missouri, W.D.

April 10, 1989.

Carroll E. McCue, Gwen G. Caranchini, the Law Offices of Gwen G. Caranchini, Kansas City, Mo., and Linda Skinner, Overland Park, Kan., C. John Forge, Jr., Independence, Mo., for plaintiff.

Paul Scott Kelly, Jr., Jack Yates, Gage & Tucker, Kansas City, Mo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER GRANTING JUDGMENT FOR DEFENDANT AND AGAINST PLAINTIFF

BARTLETT, District Judge.

### I. *Introduction*

Plaintiff Melody Perkins brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Perkins, a female supervisor at the General Motors (G.M.) Fairfax Plant in Kansas City, Kansas (Fairfax), contends that she was unlawfully discriminated against by G.M. on the basis of her sex in violation of § 703 of the Act, 42 U.S.C. § 2000e–2.

Perkins maintains that she was the victim of sexual harassment between August 1978, and January 1986, while employed at the Fairfax plant.[1] Specifically, Perkins, an avowed homosexual, claims that as a condition of her employment she was forced to have sex with Thomas Spivey, the body shop superintendent and her indirect supervisor, from shortly after she began her employment in 1978 until 1985, when she terminated the relationship. Perkins maintains that in order to obtain sexual favors, Spivey threatened her job and her life and the life of her lesbian lover. She maintains that sex with Spivey was always unwelcome and she points to her homosexual lifestyle and 14 year relationship with her lesbian lover to emphasize the unwelcomeness of Spivey's conduct. Perkins contends that the acts of Spivey constituted quid pro quo sexual harassment and created a sexually hostile work environment.

---

1. Title 42 U.S.C. § 2000e–5(e) states that only incidents that allegedly occurred within 300 days prior to the filing of the EEOC charge are actionable. At the September 23, 1988, oral argument on defendant's summary judgment motions, plaintiff voluntarily dismissed all claims for damages arising from incidents occurring in 1978, 1979 and 1980. Testimony of alleged incidents occurring during this period were considered as background evidence only.

However, because of the possibility that plaintiff might have established a "continuing violation," evidence was heard on plaintiff's claims from May 1982, when Perkins returned from Bowling Green to Fairfax until January 1986, when she filed her EEOC charge. In light of the ultimate disposition of this case, a definitive ruling on the statute of limitations question became unnecessary.

Perkins also claims that she was subjected to an unwelcome sexually hostile work environment at Fairfax because of the acts of other male employees.

G.M. acknowledges that Perkins and Spivey had a sexual relationship but argues that the relationship was instigated and pursued by Perkins in order to advance her career at G.M. and to demonstrate to her parents, who did not approve of her homosexual lifestyle, that she was a worthy daughter.

G.M. asserts that Perkins failed to establish that she was subjected to an unwelcome sexually hostile work environment.

This action was heard by the court sitting without a jury between November 1, 1988, and January 9, 1989.

## II. *Findings of Fact*

1) As a child, Melody Perkins was sexually abused by her father, a neighbor, neighborhood boys and a bus driver. Her alcoholic mother physically abused her throughout her childhood.

2) After one particularly brutal beating by her mother, Perkins left home at age 18 and moved in with Joseph Holub, a man she later married. During the brief time they lived together, Holub physically abused her. When his abuse became too much for her, Perkins left him, moved in with her grandparents and filed for divorce.

3) Shortly after leaving her husband, she enlisted in the United States Army.

4) While in the Army she met and started a homosexual relationship with Jessica Glenn which culminated in their being "married" in a ceremony conducted by a lesbian friend in July 1974. They regarded this ceremony as having the same effect as a legal marriage and they pledged a life of fidelity to each other. When Perkins told her parents about her relationship with Glenn, they objected strenuously and thereafter were largely alienated from Perkins.

5) The Perkins/Glenn relationship has continued for 14 years. Although Glenn's problems with alcohol strained the relationship, the relationship has lasted because Perkins and Glenn love and care about each other.

6) Although Perkins enjoyed her service in the Army, she did not reenlist because of what she called "witch hunts" by military authorities to eliminate homosexuals from the Army.

7) After leaving the Army, Perkins was accepted by the Federal Aviation Administration for training as an air traffic controller. After completing her initial training at the FAA training center in Oklahoma City, Oklahoma, she was assigned to Ballard Field in Topeka, Kansas.

8) While working for the FAA in Topeka, Perkins and Glenn had a number of difficulties that resulted in physical assaults on one another. In June 1977, Perkins went to the Veterans Administration Hospital in Topeka for assistance and was referred to a psychiatric social worker for evaluation. She told the social worker during an interview that although she was involved in a primary homosexual relationship with Glenn, she "still enjoys men." The social worker was sufficiently concerned about her stability, especially in light of her occupation, that he scheduled her for a complete psychiatric evaluation. Perkins failed to keep three appointments for this evaluation.

9) In June 1978, Perkins believed that she was partially responsible for a near disaster while on duty as an air traffic controller. She felt that she could no longer handle the stress of her job and approached the Veterans Hospital in Topeka for medical justification to be relieved of her duties. This justification was provided by the V.A. in a letter to her Tower Chief indicating that "her increasing anxiety over her job responsibilities are sufficiently high that in her best interest serious consideration should be given to the idea of relieving her of her present duties." Perkins was then placed on a leave of absence from the FAA.

10) On June 19, 1978, while on leave from the FAA, Perkins applied at the Fairfax plant on the recommendation of a female friend who was employed at the G.M. Leeds plant in Kansas City, Missouri.

11) Perkins was initially interviewed by John Muehlbach of the personnel department. He felt that she was a good candidate because her service in the Army and as an air traffic controller indicated an ability to work under pressure and to supervise others.

12) Perkins was also interviewed by several superintendents at the plant, including Thomas Spivey, who was superintendent of the body shop.

13) Perkins was first employed by G.M. Fairfax on July 24, 1978, as a salaried employee in training. She was the first female hired for a production supervisor's position from outside the hourly rolls at the plant.

14) Perkins was told that she would be entering a training program that would expose her to all facets of automobile assembly. Also, she was advised that during her training, she would have to sufficiently impress a superintendent or department head so that she would be sponsored for regular employment in that department after her training. She was also told that if she had not received an offer of employment from a superintendent or department head at the end of her training, she would be released.

15) Shortly after Perkins began her training, Spivey asked her to work for him in the body shop. Perkins was excited about the prospect of finding a sponsor so early in her training and told Glenn how pleased she was to have made such a good impression so early.

16) Perkins successfully completed her supervisor in training program on March 1, 1979, and became a regular supervisor in the body shop performing various supervisory duties until May 1, 1980, when she was laid off as part of an economic reduction in force.

17) Perkins was ambitious and wanted to be promoted to higher management levels as demonstrated by her career interests shown on her annual appraisals. Specifically, she wanted to be the first woman promoted to general supervisor in a production department and eventually she wanted to be superintendent or plant manager.

## A. Perkins' Quid Pro Quo Claim

18) Both Perkins and Spivey testified that a sexual relationship existed between them. Their testimony about how often they met and where they met was by and large consistent. However, they disagreed about whether Perkins was coerced to participate in the relationship. For the reasons indicated below, I believe Spivey's testimony and disbelieve Perkins' testimony about how the relationship began and the reasons it continued.

19) Perkins testified that in August 1978, shortly after she started to work in the body shop, Spivey told her that he would like to take her home with him that evening. She initially refused but agreed after Spivey said that if she did not he would fire her. He then gave her a key and written directions to his apartment. She drove herself to his apartment and waited for him to arrive. When he arrived, he forced her to take off her clothes and have sex with him. He demanded that she spend the night. She declined saying that Glenn would be worried. Under pressure from Spivey, she called Glenn and told her that she would be staying with her grandparents that evening. Perkins testified that she and Spivey had sex several times that night. At one time during the night, Spivey waved something at her. Perkins believes it may have been a knife.

20) Perkins testified that thereafter Spivey made similar demands on her approximately twice a month from August 1978, until May 1980, when she was laid off. These encounters with Spivey were usually right after work and lasted two to two and one-half hours with the actual sex only taking a small part of the total time. According to Perkins, the balance of the time they drank cocktails and talked about such things as work, Perkins' goals and ambitions, Jessica Glenn, Perkins' prior marriage, Spivey's daughter and Spivey's interest in horse racing. On some occasions, Spivey prepared a meal or brought in food.

21) Perkins testified that she did not want Glenn to know of these encounters with Spivey so Perkins told her that she

was late coming home from the plant due to "meetings related to her job."

22) Perkins testified that several times during 1978–80 she failed to meet Spivey at his apartment or at a motel as he directed. Spivey threatened her with a knife or a gun and threatened to kill or injure Glenn.

23) Perkins testified that in 1979 Spivey forced her to go on a three day fishing trip to Grand Lake, Oklahoma. While there, Spivey would leave the room for hours and lock her in a closet. When he returned, he brought her a Pina Colada. In order to keep Glenn from finding out about the trip, Perkins suggested to Spivey that they send Glenn to California where Glenn's family lived. The airplane ticket was paid for by Spivey.

24) Perkins testified and Spivey corroborated that during their relationship, Spivey gave plaintiff an ankle bracelet and a gold letter "M" pendant. She wore the pendant and told Glenn that it was a Christmas present from her hourly employees. Perkins gave Spivey a collector's Corvette emblem she obtained while working in Bowling Green, Kentucky.

25) Perkins testified that Spivey frequently suffered from alcohol induced impotence. To assist with penetration he would use her vibrator to stimulate her and increase lubrication.

26) Spivey testified that shortly after Perkins began working in the body shop, she made it apparent to him that she was available and interested in having sex with him. He admitted that he invited her to his apartment and gave her a key and directions. When he arrived at his apartment, plaintiff was sitting in a chair reading a magazine, clad only in his bathrobe, having taken a bath prior to his arrival. They had sex several times and she spent the night.

27) Spivey testified that thereafter he and Perkins engaged in a consensual affair meeting approximately two times a month from August 1978, until May 1980, when plaintiff was laid off. She told him of her homosexual relationship with Glenn but said that she still liked sex with men. He corroborated plaintiff's testimony that their meetings lasted two to two and one-half hours and that no more than 15 to 20 minutes of that period involved sex. The remaining time was spent in casual conversation. He acknowledged that he occasionally fixed meals or brought in food.

28) He corroborated the trip to Grand Lake but denied that it was coerced. Perkins enjoyed fishing and they both wanted the opportunity to be able to go out in public. He denied locking her in a closet. He verified that he paid for Glenn's ticket and that it was Perkins' idea to send Glenn home.

29) I am persuaded that Perkins and Spivey went to Grand Lake, Oklahoma, for a three day fishing trip in 1979 and that Perkins welcomed the opportunity to travel out of town with Spivey. It was Perkins' idea to send Glenn to California and Spivey paid for Glenn's airplane ticket. I do not believe Spivey locked Perkins in a closet. The locked-in-the-closet gloss on the Grand Lake trip is an illustration of Perkins' fertile imagination.

30) Spivey denied that he ever used any threat or coercion to secure sexual favors from Perkins and testified that plaintiff would initiate their meetings about one third of the time. He enjoyed sex with Perkins and felt she enjoyed it as well.

31) In October 1979, Muehlbach was working at the G.M. plant under construction in Bowling Green, Kentucky. When he learned of the Fairfax layoff, he contacted Schmer, General Supervisor of Salaried Personnel, to determine which female supervisors were on layoff because he needed qualified females to meet his affirmative action obligations. He hired three female supervisors (Perkins, Linda Sims and Delores Clemoens) for the Bowling Green plant.

32) Perkins did not want to go to Bowling Green but was persuaded by Glenn to go in order to get away from Perkins' parents and also because Glenn's family was originally from that area of Kentucky.

33) While at Bowling Green, Perkins frequently spoke highly of Spivey and the Fairfax plant and stated that she would

like to return to Fairfax if the opportunity arose.

34) Spivey testified that plaintiff got in touch with him when she was in Kansas City in December 1981, and asked to meet him. They had sex on that occasion and she gave him the Corvette emblem.

35) While at Bowling Green, Perkins learned that Fairfax was going to return the second shift from lay off. Perkins telephoned Spivey and requested his assistance in getting back on at Fairfax. After she was laid off at Bowling Green, Fairfax offered her a position and she returned to the body shop at Fairfax in May 1982.

36) Perkins' and Spivey's testimony about the resumption of their sexual relationship after Perkins' return to Fairfax is partially consistent. Where inconsistent, Spivey's version is more credible.

37) Perkins testified that Spivey made no effort to resume the relationship between May 1982, when she returned, and October 1982, when he demanded with threats to her employment and well-being that the sexual relationship resume. According to Perkins, she was forced to have sex with him two or three times between October 1982, and January 1983.

38) Spivey agrees that their sexual relationship was renewed in the fall of 1982. He testified that he was seeing another woman when Perkins returned from Bowling Green and that he did not want to get involved with Perkins again. However, Perkins was insistent and because he enjoyed sex with her, he agreed. They had sex two or three times before she went to Operation Wyandot.

39) Perkins testified that Spivey made one demand for sex between January and October 1983, while she was assigned off site to Operation Wyandot, a training program instituted by the Fairfax plant to increase cooperation among its employees.

40) Perkins' testimony about one act of sex with Spivey during this period is contrary to her interrogatory answers where she denied having any sex with Spivey between January and October 1983. Her trial testimony would help explain a complaint that she made to her gynecologist in August 1983, that she was experiencing pain during deep penetration.

41) Perkins testified that after Operation Wyandot, Spivey demanded sex from her twice a month from October 1983, until July 1985, excluding only the period January to April 1985, when she was on the second shift and Spivey was on the first.

42) Perkins testified that in April 1985, while at Spivey's residence in Gladstone, Missouri, Spivey took her out on the balcony, held a long barrelled, large caliber revolver over her shoulder, fired it into the ground and told her to imagine what that bullet would do to her head. He then took her into his bedroom, tied her with neck ties to the bed in a spread eagle fashion and forced the barrel of the pistol into her vagina, cocked it, removed it and then had sex with her. She sought no medical attention for injuries caused by the gun but did go to a park to sit on the cool ground.

43) Spivey denies that the gun incident occurred. He points to the serious damage to the side of one's face and ear that would result from having a large caliber revolver fired in the manner Perkins described.

44) I do not believe that the gun incident occurred. The residential setting of Spivey's house makes it unlikely that a gun fired in mid afternoon would not attract concerned attention. Furthermore, Perkins did not report this attack to anyone, including her attorney and psychological counselors, until March 1987, two years later. The tendered explanation by one of Perkins' psychological counselors for this delay was not persuasive. Also, on one day during her trial testimony she identified a Ruger revolver as the gun Spivey used; the next day she changed her testimony expressing doubt that the gun was the same one Spivey had used in April 1985. Overnight, Perkins realized how implausible her story was given the size of the barrel, the height and size of the front sight and the manner in which she claimed Spivey used it. Perkins' description of the incident seems to be the result of a fertile and twisted imagination.

45) Perkins testified that on occasion during their sexual encounters, Spivey would hold a knife taken from behind his belt buckle to her throat and trace the outline of her body with it while threatening her with injury or death. Spivey denies using the knife to threaten Perkins.

46) Perkins has failed to persuade me that she was ever threatened with the knife. Considering all the testimony about the belt buckle knife, including a demonstration engineered by plaintiff's counsel that reached ludicrous levels even for this case, I am persuaded that it was worn by Spivey and used by him in the same manner some people use a pocket knife.

47) Spivey testified that the relationship resumed after Operation Wyandot and continued until March or April 1984. He terminated the relationship because Perkins was making demands upon him to use his influence to have her promoted to a general supervisor vacancy created by the death in December 1983 of Jack Reynolds, a body shop general supervisor. Spivey testified that thereafter Perkins learned that another woman, Kathy Tucker, had been promoted and became the first female general supervisor in a production department at Fairfax.

48) After receiving her performance appraisal in the summer of 1984, Perkins went to Cinda Clark, EEO supervisor, to complain that she believed Spivey had altered her suitability for promotion rating on that appraisal. Clark obtained the appraisal, reviewed it with Perkins and they agreed that Perkins' concerns were unwarranted. Notably, Perkins did not complain about Spivey's alleged sexual demands, threats or the atmosphere in the plant that plaintiff now contends was so offensive to her.

49) Perkins testified that while on vacation in the Bahamas in July 1985, she contemplated suicide but then had a religious experience in which she realized that if she committed suicide she would not go to Heaven. On the other hand, if Spivey killed her she was confident that she would go to Heaven. Therefore, when she returned from vacation, she terminated the relationship with Spivey. She told him that she no longer cared if he carried out his threats.

50) Perkins testified that once she told Spivey that she would no longer have sex with him, he continued to demand sex. When she continued to refuse, she claims that he retaliated by 1) having her transferred from a preferred assignment in High Bay back to the body shop, 2) causing a poor evaluation of her in September 1985, 3) depriving her of the necessary manpower to perform her duties satisfactorily and 4) causing her to be more closely scrutinized by her superiors.

51) In the summer of 1985, after she claimed to have told Spivey that she would no longer have sex with him, Perkins began to have problems with "door fits" in her department in High Bay. When these problems could not be resolved to her satisfaction with the body shop supervisors or Spivey, she complained to Arthur Hester, the production manager, who was Spivey's superior. Despite the opportunity to do so, Perkins made no complaints to Hester about Spivey's alleged sexual demands.

52) Perkins' transfer from High Bay was a result of this door fit problem, not anything Spivey did. The decision to transfer Perkins was made by William Holek, acting superintendent of the body shop.

53) Although Perkins normally received her annual appraisal in July, she did not receive her 1985 appraisal until September 13, 1985. That appraisal included the August 1984–July 1985, period, as well as August and part of September 1985, and reflected the problems Perkins was experiencing in High Bay. It was the lowest appraisal she had received at G.M.

54) Perkins complained about this appraisal to Schmer and Joelle Thomas (then EEO supervisor) whom Perkins knew from when Thomas was labor relations representative for the body shop. Perkins told them that she felt it was not fair for an appraisal to reflect performance difficulties occurring after the appraisal should have been given. Also, Perkins said that she had not been properly counseled about these deficiencies prior to receiving the

evaluation. Again, she did not mention to Thomas or Schmer Spivey's alleged demands for sex or her belief that Spivey was responsible for the low appraisal. As a result of Perkins' complaint, her performance was reevaluated by Holek and her evaluation was raised to a satisfactory level. Spivey's only role in this evaluation was his suggestion that Holek consider Perkins' complaint.

55) There was no credible evidence that Perkins was treated differently than other supervisors in terms of having the people necessary to do the work in her area. Also, Perkins was not scrutinized more closely by the body shop general supervisors.

56) In the latter part of 1985 and early 1986, it was well known among the Fairfax salaried work force that the planned move to the new Fairfax plant would result in substantially fewer hourly and salaried employees in the production process. Supervisors at Perkins' level with relatively short lengths of service were considered to be at risk. During this time, Perkins contacted Sonny Lyman, the union bargaining chairman, to seek his assistance in obtaining a position at Fairfax that would increase her chances of being selected for the new plant.

57) During the fall of 1985, Perkins enrolled in a business law course at Penn Valley Community College. Thereafter, she told several co-workers that she had a plan to "get" G.M. and that she would not have to work again.

58) Spivey testified, and I find it credible, that on January 27, 1986, Perkins came to him to demand a promotion or a "pencil pushing job" out of the body shop and that if she did not get what she wanted, she "was a woman in a man's world and was going to get what [she] wanted any way [she] could." He told her to "take your best shot."

59) Perkins testified that Spivey approached her on January 27, 1986, for the

last time and demanded sex from her. When she refused, Perkins said that he threatened her life and her job. Then according to Perkins, Spivey, the then acting general superintendent, directed Keith Powell, acting general supervisor, and William Holek, acting superintendent of the body shop, to criticize Perkins during a housekeeping tour of her area on January 30, 1986.

60) Housekeeping in Perkins' area was criticized justifiably. Other supervisors were criticized as well. Upon hearing the critical evaluation, Perkins used the Open Door Policy [2] and went immediately to see Schmer and Hester telling them that Spivey had been raping her since 1978 and that as a result of refusing Spivey's demands for sex, she was being harassed by her supervisors in the body shop.

61) After being interviewed by Hester and Schmer, Perkins left the plant, went to see an attorney and prepared an EEOC charge of discrimination alleging sexual harassment. Her attorney then arranged for her to be admitted to the psychiatric unit at St. Luke's Hospital.

62) Hester and Schmer reported their interviews to Timothy Danahy, personnel director, who undertook a full investigation of Perkins' claims. Interviews were conducted with Spivey, Holek, Powell, other supervisors who were also subjected to the housekeeping tour, Lisa Calovich (a student training with Perkins), the female supervisors of the body shop and later, after the allegations of a sexually hostile work environment surfaced in Perkins' lawsuit, all of the female supervisors at Fairfax. Because she was under a doctor's care, Perkins was not interviewed until April 1986.

63) Following a thorough investigation, G.M. concluded that Perkins' allegations were uncorroborated and implausible, that Spivey had not sexually harassed Perkins and that she had not been harassed by the supervisors in the body shop. However, G.M. determined that Spivey had shown

---

**2.** Under the "Open Door" policy which is well publicized in G.M.'s booklet for salaried employees, an employee is authorized and encouraged to bring problems to his or her supervisor or, if that is inappropriate because the supervisor is involved, to the personnel department or higher levels of management.

extremely poor judgment by becoming involved in a consensual sexual relationship with a subordinate. He was demoted from the bonus eligible group of G.M. management and transferred to a G.M. plant in Atlanta, Georgia.

64) Perkins testified that she never reported Spivey's acts to the police, Glenn or to anyone in authority at G.M. She testified that she was unable to do so because of her fear of Spivey, the lack of an appropriate complaint procedure at G.M. and her past history as a victim of sexual and physical abuse. I do not believe that if Spivey had been sexually harassing her, she would not have availed herself of the readily available and known complaint procedures, including the Open Door policy. Throughout her employment, Perkins was aware of the avenues available to her to express any concerns or complaints she might have about problems on the job.

a) For example, on Perkins' first day of employment, Schmer and Muehlbach advised her that some employees might resent being supervised by a female. She might experience rough language on the floor and possibly unwelcome sexual advances. She was told to take any problems which she could not handle to her superiors. Perkins assured them that she had encountered these problems in the military and that she did not expect anything she could not handle.

b) During her Fairfax pre-supervisory training, Perkins received training on her equal employment opportunity rights and responsibilities as a supervisor from Cinda Clark, then the EEO supervisor. In this training Clark explained G.M.'s legal obligation not to discriminate on impermissible grounds, including sex, and that the EEO supervisor was available for internal complaints of discrimination.

c) In the latter part of 1979, G.M. implemented a management women's program at Fairfax coordinated by Clark to assist women production supervisors. Participation was voluntary but most of the female supervisors, including Perkins, participated. No complaints of unwelcome sexual conduct were raised by Perkins or any other female supervisors during these meetings.

d) Perkins knew she could bring complaints about sexual harassment and other problems to the EEO supervisor. Perkins complained in 1981 to Kathy Herkleman, the Bowling Green EEO supervisor, about sexual comments made to her by an hourly employee at that plant. The matter was resolved to her satisfaction. In 1984, Perkins complained to Clark that Spivey had altered her eligibility for promotion rating on her annual appraisal. In September 1985, Perkins contacted Joelle Thomas, then the EEO supervisor, about her late annual appraisal.

e) In 1984 or 1985, Jack Clay, an hourly employee in the body shop under Perkins' supervision, touched Perkins on the breast. She immediately exercised her supervisory authority and had Clay taken to labor relations for a disciplinary interview. Labor relations concurred in Perkins' recommendation that Clay be counseled about his inappropriate conduct. The matter was resolved to Perkins' complete satisfaction.

f) In 1985, when Perkins was experiencing the "door fit" problem in High Bay, she went to Hester, the production manager and Spivey's supervisor, to complain that she felt Spivey and the body shop were not responsive to her suggestions for solving the problem.

g) In January 1986, Perkins went to Hester and the personnel department under the G.M. "Open Door" policy to register her first and only complaint about Spivey's alleged sexual acts.

65) Despite the testimony of Perkins' psychological counselors, I was not persuaded that their Post–Traumatic Stress Disorder (PTSD) diagnosis corroborates Perkins' version of her affair with Spivey. My impression was that PTSD is the current diagnosis of choice with Perkins' psychologists and they fit their patient to that diagnosis. Also, because Perkins participated in the relationship with Spivey for her own personal gain and because Perkins failed to persuade me that the relationship or any event in it was a credible stressor beyond the realm of normal human experi-

ence, the stressor essential for the diagnosis does not exist.

66) During the entire trial, including numerous conferences, I had an opportunity to observe and evaluate Perkins. Also, I observed Spivey when he testified. Based upon these observations and upon all of the credible evidence, Spivey's version of the Spivey/Perkins relationship was credible and Perkins' version was not. The sexual relationship with Spivey was welcome to Perkins. In reaching this conclusion, I rely not only on the findings previously made but also on the following:

a) Perkins is not the downtrodden victim she attempted to portray throughout the trial; Perkins is an intelligent, articulate, aggressive, ambitious, tough and friendly person who has good people skills. She was and is a strong person, well able to fend for and defend herself.

b) Before Perkins came to G.M., she had escaped from stressful or unpleasant situations. She was able, upon reaching majority, to escape from her abusive parents; she left an abusive husband; she left the Army when she believed that her homosexuality would be discovered; she left the FAA when the stress became too great. However, when allegedly victimized by Spivey, she made no attempt to leave G.M. or even to complain.

c) Perkins hoped that the relationship with Spivey would advance her career at G.M. Perkins is ambitious in the sense of succeeding in what she perceives to be male dominated workplaces. Using Spivey, a macho male in her view, to accomplish this goal pleased her. Also, by being the first woman general supervisor, she hoped to win the respect of her parents.

d) Perkins was a supervisor, not an hourly employee. Therefore, she had regular contact with upper management.

e) Viable and effective complaint procedures were available at Fairfax that were known to and used by Perkins while employed there. Yet, she did not utilize any of these procedures to seek relief from years of alleged threats and assaults until after the sexual relationship had been terminated by Spivey and after another woman had been promoted.

f) Because Perkins and Glenn convinced me that their relationship was close, warm and communicative, it is incredible that, if things were as Perkins says, Perkins would not have shared her pain with Glenn or that Glenn would not have observed Perkins' tortured behavior and press for an explanation.

g) In late 1979, Perkins made no effort to dissuade Glenn from going to work at Fairfax even though Perkins was by this time involved in what she says was a violent relationship with Spivey. If Perkins' version of the affair were true, she would not have wanted Glenn to work in the same location as the man who was threatening Glenn's life.

h) Also, if Perkins were telling the truth about the nature of the relationship with Spivey, it makes no sense that she told people at Bowling Green how much she missed Fairfax and frequently called back to the body shop to see how her old friends at the plant were doing. Despite the safety of being several hundred miles away from Spivey, she made no complaints about him to G.M. management or other authorities. When she learned of the possibility of the recall of the second shift at Fairfax, she telephoned Spivey to seek his assistance in returning to her old job in the body shop under his supervision. None of the attempted explanations as to why someone who had escaped from such a situation would voluntarily return reasonably explain re-exposing herself to the demeaning, life threatening and abhorrent behavior she claimed to have been subjected to by Spivey.

i) David Hiatt's testimony about his conversation with Perkins in late 1978 or early 1979 about Spivey "sexually harassing" her is not credible. At that time, a year before the EEOC Guidelines on Sexual Harassment were issued, that term was uncommon in the legal community, much less among hourly production workers.

j) Perkins was not exclusively homosexual as she claimed. She had been

married, admitted she had initiated sex with her husband, become pregnant and had an abortion. A year before she came to G.M. she told a Veterans Administration Psychiatric Social Worker that although she was involved in a homosexual relationship with Glenn, she was a bisexual who still liked sex with men on occasion, a statement she reiterated to Spivey when they began their relationship. She complained to her gynecologist of pain during intercourse in August 1983, during a time she was not seeing Spivey, yet testified that she and Glenn used no devices during their sex other than a small vibrator. Plaintiff offered no reasonable explanation for why a true lesbian would tolerate a regular sexual relationship with a man. Perkins was also unable to persuasively explain why Spivey would engage in a long-term sexual relationship with somebody who found sex with a man distasteful.

k) In December 1985, Perkins told Gary Maltbia, the union Employee Assistance Program Coordinator, that she had been having an "affair" with Spivey. Also, she told Sonny Lyman after she left the plant that she once thought she loved Spivey and would "do it all over again" if she could only get a promotion.

l) In contrast to the many aspects of Perkins' story that make no sense, Spivey's testimony about the relationship was credible. Spivey's credibility is enhanced by his admitting the relationship when first confronted with Perkins' allegations. His demeanor on the stand was consistent with the words he used. His answers to questions were direct in marked contrast to Perkins' frequent evasiveness and acting.

m) Women supervisors, including many called by Perkins, testified that Spivey was a gentleman who never approached them in a sexually offensive way.

**B. Perkins' Hostile Environment Claim**

67) Perkins claims that she was subjected to an unwelcome sexually hostile work environment throughout her employment at Fairfax resulting from the acts of Spivey and the acts of other male employees at the plant.

68) The acts of Spivey asserted as a basis for the sexually hostile work environment claim are identical to those relied upon for the quid pro quo claim. My findings on the quid pro quo claim dispose of this aspect of the sexually hostile work environment claim.

69) The other incidents about which Perkins complained at trial are of two types: directional, i.e., specifically directed at her, and nondirectional, i.e., not specifically directed at her but observed or overheard by her.

70) Representative of the events that Perkins claims caused her environment to be sexually hostile are the following: [3]

a) She was subjected to catcalls, whistles and comments by male employees throughout her employment at Fairfax.

b) She was propositioned from 15 to 50 times a day by men at the plant throughout her employment at Fairfax.

c) Jack Clay, an hourly employee in the body shop, touched her on the breast in 1984 or 1985. She exercised her authority as a supervisor and had him sent to labor relations for a disciplinary interview. The nature of his punishment was left to her discretion. She decided that in light of his exemplary work record and length of service the appropriate punishment was formal counseling. This counseling was conducted by Perkins and Sonny Lyman, Chairman of the Union Shop Committee. Perkins was satisfied with the way this incident was handled.

d) Ron Welch, a maintenance department general supervisor, told Perkins in 1984 that "if you don't use your pussy, you will lose it." When she told him that she did not like such comments, he told her that he would not make such comments any more.

---

**3.** Other incidents referred to by Perkins were not significantly different in nature or character from those listed in this finding. The additional events referred to by Perkins are no more credible or persuasive than the ones referred to in the findings.

e) In 1985 she found a hot dog in her desk with a condom on it. She did not know who placed it there.

f) In late 1985, Greg Hendricks, an hourly employee under her supervision, made a "humping motion" in her direction when he objected to the job she had assigned him. She then told him that if he did not do what she told him, she would "castrate him in the pit," referring to the worst job in her group. When Hendricks complained to his union committeeman the committeeman supported Perkins.

g) From time to time throughout her employment, George Lewis, a supervisor in the body shop, and Don Kyle, a supervisor in the maintenance department, would make motions with their hands simulating masturbation in her presence.

71) Perkins also testified about the following non-directional incidents: she overheard jokes of a sexual nature; observed men grab their genitals and "shake" them at one another; and heard "shop talk," i.e., nondirectional profanity by employees, male and female.

72) Perkins' testimony about the prevalence of catcalls and propositions for sex was not credible. Based on the testimony of other witnesses who were more credible, catcalls were directed on occasion to new women who appeared on the production floor such as visitors and newly hired employees. No other witness confirmed that sexual propositions occurred at the rate suggested by Perkins. Based on all the evidence, her testimony on this point seems to be more creative than factual.

73) The directional conduct about which Perkins complains was welcomed and encouraged by her. Perkins was an active and encouraging participant in sexually explicit conversation and actions. Her use of "shop talk" was well known and thought by some to be extreme even for the environment. She was observed goosing men or pinching or patting them on their buttocks, putting her hands inside the front of men's coveralls and on one occasion brushing her hand across the genitals of a fellow supervisor and asking him, "Is that your pickle?" I reject the suggestion that Perkins engaged in this activity solely because she had no choice if she was going to work on the production floor at Fairfax. Based on Perkins' background before coming to G.M. and on her performance over many years at G.M., I am persuaded that Perkins enjoyed the give and take with men and women on the production floor. She took pride in her people skills and had a genuine interest in a close relationship with the people she supervised. The environment was welcome and familiar to her.

74) When her encouragement of and participation in sexual horseplay precipitated unwelcome conduct, Perkins knew how to use the available disciplinary procedures and had the supervisory power to stop the conduct and punish the offender. When Perkins complained or made it known that she did not like the conduct, the conduct ceased immediately or was dealt with appropriately.

75) For all these reasons and on the basis of my assessment of the credibility of the witnesses and all of the evidence offered at trial, including Perkins' various offers of proof, I find that Perkins was not subjected to unwelcome conduct of a sexual nature, the submission to which was made either explicitly or implicitly a term or condition of her employment. Furthermore, submission to or rejection of unwelcomed conduct of a sexual nature was not used as the basis for any employment decision affecting her. She was not subjected to an intimidating, offensive or sexually hostile working environment.

### III. *Conclusions of Law*

1) Perkins, a female supervisor at the General Motors Fairfax plant in Kansas City, Kansas, brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §, 2000e *et seq.* contending that she was sexually harassed in violation of § 703 of the Act, 42 U.S.C. § 2000e–2.

2) Jurisdiction and venue are proper in this court. 28 U.S.C. §§ 1331, 1343, 1391; 42 U.S.C. § 2000e–5(f)(3).

3) Plaintiff bears the burden of persuasion as to each essential element of her claim; she must establish the existence of each element by a preponderance of the credible evidence. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973).

4) Preponderance of the evidence means the greater weight of evidence. "It is the evidence which, when weighed with that opposed to it, has more convincing force and is more probably true and accurate." *Smith v. United States*, 726 F.2d 428, 430 (8th Cir.1984). "If, upon any issue in the case, the evidence appears to be equally balanced, or if it cannot be said upon which side it weighs heavier, then plaintiff has not met his or her burden of proof." *Id.*

5) This case has been decided primarily upon credibility of the witnesses and particularly the credibility of the two principals, Melody Perkins and Thomas Spivey. In making credibility determinations, I have considered the relationship of the witnesses to the parties, the witnesses' interest in the outcome of these proceedings, the witnesses' demeanor while testifying, the witnesses' opportunity to observe and acquire knowledge of what they were testifying about and the extent to which the testimony was supported or contradicted by other credible evidence. *See Shrout v. Black Clawson Co.*, 689 F.Supp. 774, 775 (S.D.Ohio 1988).

6) The gravamen of any sexual harassment claim is that the alleged acts of misconduct were "unwelcome." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49 (citing 29 C.F.R. § 1604.11(a)). The conduct complained of must be " 'unwelcome' in the sense that the employee did not solicit or invite it, and the employee regarded the conduct as undesirable or offensive." *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir.1986). In analyzing this element of a sexual harassment claim, courts have looked to a number of facts:

a) Whether plaintiff by her own conduct indicated that the alleged sexual advances were unwelcome. *Vinson*, 477 U.S. at 68, 106 S.Ct. at 2406.

b) Whether the plaintiff substantially contributed to the alleged distasteful atmosphere by her own "profane and sexually suggestive conduct." *Gan v. Kepro Circuit Systems, Inc.*, 28 Fair Emp.Prac. Cas. 639, 640–41 (E.D.Mo.1982); *Smith v. Acme Spinning Co.*, 40 Fair Empl. Prac.Cas. 1104, 1105, 1986 WL 7814 (W.D.N.C.1986).

c) Whether the plaintiff in response to evidence that at various times she had willingly participated in the conduct now complained of can "identify with some precision a point at which she made known to her co-workers or superiors that such conduct would henceforce [sic] be considered offensive." *Loftin–Boggs v. City of Meridian*, 633 F.Supp. 1323, 1327 n. 8 (S.D.Miss.1986), *aff'd mem.*, 824 F.2d 971 (5th Cir.1987). *See also* EEOC Policy Guidance on Sexual Harassment, *reprinted in Daily Labor Report* (BNA) No. 201, Section E (Oct. 10, 1988) at 3.

d) Whether and, if so, when, plaintiff reported or complained about any of the incidents at issue. *Highlander v. K.F.C. National Management Co.*, 805 F.2d 644, 646, 650 (6th Cir.1986); *Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 214 (7th Cir.1986); *Acme Spinning Co.*, 40 Fair Empl. Prac. Cas. at 1109; *Neville v. Taft Broadcasting Co.*, 42 Fair Empl. Prac.Cas. 1314, 1317, 1987 WL 9638 (W.D.N.Y.), *aff'd mem.*, 857 F.2d 1461 (2d Cir.1987); *Jensen v. Kellings Fine Foods, Inc.*, 1987 U.S. Dist.Lexis 7221; *Spencer v. General Electric Co.*, 697 F.Supp. 204, 210 (E.D.Va.1988).

e) Whether plaintiff's account of the "unwelcome" sexual conduct is sufficiently detailed and internally consistent so as to be plausible. EEOC Policy Guidance at 3.

f) The nature of the work environment itself. *Rabidue v. Osceola Refining Co.*, 584 F.Supp. 419, 430 (E.D.Mich.1984), *aff'd*, 805 F.2d 611, 620–21 (6th Cir.1986); *Hall*, 842 F.2d at 1017–18.

**1500**

## A. Quid Pro Quo Claim

7) As the Sixth Circuit noted in *Highlander v. K.F.C. National Management Co.*, 805 F.2d 644 (6th Cir.1986):

> Quid pro quo sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriments. In a *quid pro quo* action, the employee bears the burden of proof to support charges that submission to the unwelcomed sexual advances of supervisory personnel was an express or implied condition for receiving job benefits or that a tangible job detriment resulted from the employer's [sic] failure to submit to the sexual demands of supervisory employees.

*Id.*, 805 F.2d at 648. *See Hall v. Gus Construction Co., Inc.*, 842 F.2d 1010, 1013 (8th Cir.1988); *Jones v. Wesco Investments, Inc.*, 846 F.2d 1154, 1156 (8th Cir. 1988).

8) In order to establish a quid pro quo claim of sexual harassment, plaintiff must prove each of the following elements: 1) that she was a member of a protected class; 2) that she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was based on sex; 4) that her submission to the unwelcome advances was an express or implied condition of receiving job benefits or that her refusal to submit to a supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability. *Highlander*, 805 F.2d at 648; *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir.1982).

9) Perkins was a member of a group of persons protected by Title VII, i.e., females.

10) Perkins failed to establish by a preponderance of the evidence that she was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors. To the contrary, Perkins welcomed the sexual relationship with Spivey. She entered into the relationship and remained in it for years to enhance her career at G.M.

11) Not surprisingly in light of the previous finding, Perkins failed to establish that Spivey's advances were unwelcome, that they were an express or implied condition of receiving job benefits or that her refusal to submit to Spivey's sexual demands resulted in any job detriment.

## B. Sexually Hostile Work Environment Claims

12) Plaintiff's claim of a sexually hostile work environment violative of Title VII is in two parts: a) the acts of Spivey which form the basis of her quid pro quo claim and b) acts of other male Fairfax employees.

13) In order to establish a sexually hostile work environment sufficient to establish a violation of Title VII, plaintiff must prove each of the following elements: 1) that she belongs to a protected group; 2) that she was subjected to "unwelcome sexual harassment" 3) that the harassment was based on sex; 4) that the harassment affected a "term, condition or privilege" of her employment; and 5) that the employer knew or should have known of the harassment and failed to take proper remedial action. *Hall v. Gus Construction Co.*, 842 F.2d 1010, 1013 (8th Cir.1988); *Moylan v. Maries County*, 792 F.2d 746, 749 (8th Cir. 1986).

14) For the reasons previously stated, neither Spivey nor the relationship with Spivey subjected Perkins to unwelcome sexual harassment affecting a term, condition or privilege of employment.

15) With regard to Perkins' claims based on the actions of other male employees at Fairfax, Perkins failed to establish by a preponderance of the evidence that she was subjected to conduct of a sexual nature which she found to be unwelcome, except for isolated incidents. Perkins was an active, encouraging participant in sexually explicit conversations and actions. In those few circumstances where the conduct went too far, she demonstrated that she

had the ability to take care of the situation and to stop that conduct.

16) With regard to the fourth element that the unwelcome sexual harassment affected a term, condition or privilege of employment, Perkins is required to establish that the unwelcome conduct was "sufficiently severe or pervasive [so as] to alter the conditions of [the plaintiff's] employment *and* create an abusive working environment." *Vinson,* 477 U.S. at 67, 106 S.Ct. at 2406 (emphasis added). To satisfy this element, the sexual harassment must be so severe and pervasive that it both 1) unreasonably interferes with plaintiff's work performance and 2) creates an intimidating, hostile or offensive working environment that seriously affects plaintiff's psychological well-being. *See, e.g., Rabidue,* 805 F.2d at 619. Moreover, plaintiff must satisfy this two-prong element from an objective "reasonable person" standard.

> To accord appropriate protection to both plaintiffs and defendants in a hostile and/or abusive work environment sexual harassment case, the trier of fact, when judging the totality of the circumstances impacting upon the asserted abusive and hostile environment placed in issue by the plaintiff's charges, must adopt the perspective of a reasonable person's reaction to a similar environment under essentially like or similar circumstances. Thus, in the absence of conduct which would interfere with that hypothetical reasonable individual's work performance and affect seriously the psychological well-being of that reasonable person under like circumstances, a plaintiff may not prevail on asserted charges of sexual harassment anchored in an alleged hostile and/or abusive work environment regardless of whether the plaintiff was actually offended by the defendant's conduct.

*Rabidue,* 805 F.2d at 620; *see also* EEOC Policy Guidance at 4.

17) Plaintiff must generally show a "campaign of harassment" that was "systematically directed to [her]," *Hall,* 842 F.2d at 1014–16, and that the harassment is sustained and not trivial. *Moylan,* 792 F.2d at 749–50; *Scott,* 798 F.2d at 214; *Rabidue,* 805 F.2d at 622. In making de-

terminations on this element, courts look to such factors as 1) the nature of the unwelcome sexual acts or words; 2) the frequency of the offensive encounters; 3) the total period of time over which all of the offensive conduct occurred; and 4) the context in which the sexually harassing conduct occurred. *Ross v. Double Diamond, Inc.,* 672 F.Supp. 261, 270–71 (N.D.Tex.1987).

18) Perkins has failed to satisfy her burden that the few credible unwelcome incidents *reasonably* affected a term, condition or privilege of her employment.

19) With regard to the fifth element, plaintiff has failed to establish that G.M. knew or should have known of the harassment about which she complains and failed to take appropriate action. As noted above, Perkins made no complaint about the vast majority of the incidents while still employed at G.M. In those instances when she did complain, the credible testimony established that appropriate corrective actions were taken either by plaintiff individually or in her capacity as a supervisor or by management or union officials at Fairfax.

### IV. *Conclusion*

20) Based upon these findings and conclusions, Perkins has failed to establish by a preponderance of the evidence that General Motors discriminated against her on the basis of her sex in violation of the provisions of § 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e–2.

### V. *Order*

Accordingly, it is hereby ORDERED that:

1) the clerk shall enter judgment in favor of defendant and against plaintiff with costs taxed to the plaintiff; and

2) any post-trial motions the parties desire to file, including any motions or applications for attorney's fees, costs or expenses, shall be filed within 20 days from the date of this order.