730 F.Supp. 1489 (1989)
Jacquelyn L. MORRIS, Plaintiff,
v.
AMERICAN NATIONAL CAN CORPORATION, et al., Defendants.
No. 87-1161C(3).
United States District Court, E.D. Missouri, E.D.
December 18, 1989.
Michael J. Hoare, P.C., Michael J. Hoare, St. Louis, Mo., for plaintiff.
James P. Mannion, Jr. and Sabrina M. Wrenn, Bryan Cave McPheeters & McRoberts, St. Louis, Mo., for defendants.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court to determine the merits of plaintiff's claims after a five-day bench trial.
Pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., plaintiff, a female employee of defendant corporation, contends that *1490 she was subjected to unlawful sexual harassment by defendant supervisors and other employees, and that her complaints of the harassment were not effectively resolved, resulting in plaintiff's constructive discharge in March 1987. Plaintiff was eventually reinstated in March 1988, and she claims she is entitled to lost wages, lost benefits, and seniority retroactive to her initial date of employment in 1981. Defendants counter they are not liable because (a) they had no notice or knowledge of problems encountered by plaintiff until she filed an administrative charge, and (b) once they had notice or knowledge of the problem(s), they took immediate steps to ameliorate the problems. Only Counts I through III of the amended complaint are now before the Court. See order dated September 20, 1988.
Having carefully considered the pleadings, testimony, witnesses, documents, and evidence, and being fully advised in the premises, the Court renders the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiff Jacquelyn L. Morris is a female citizen of the United States. She has been employed by defendant corporation to work at its facility in Pevely, Missouri, known as the Foster-Forbes Glass Division ("Foster-Forbes").
2. Defendant American National Can Corporation is a Delaware corporation doing business in Missouri, in part through Foster-Forbes where glass containers are manufactured. Defendant is an employer within the meaning of Title VII.
3. Plaintiff has worked as a machinist (or mold-maker) in the mold department at Foster-Forbes from on or about April 13, 1981, through March 30, 1987, the effective date of her resignation. At the time of her resignation, she was the employee in the mold department having the most seniority. She was rehired on March 8, 1988, and continues to work in the mold department at present.
4. During the period prior to April 1986, plaintiff was one of only two females in the mold department. After April 1986, she was the only female in that department. Since 1984, the mold department has had a total of either eleven or twelve employees in it.
5. Since 1983, defendant David Scott has been the Manager of Forming Operations at Foster-Forbes. He was the immediate supervisor of defendant Glenn Besore during the relevant time period.
6. During the relevant time period, defendant Glenn Besore was the Supervisor of Mold Repair at Foster-Forbes. In this position, Mr. Besore was the immediate supervisor of plaintiff and other mold department employees. As a result of his request, Mr. Besore is now a non-supervisory employee in the mold department at Foster-Forbes.
7. On July 16, 1986, plaintiff filed the first of two administrative charges of sex discrimination against defendants. Plaintiff timely filed this lawsuit after receiving her right-to-sue letter.
8. The credible testimony establishes that between 1984 and July 16, 1986, plaintiff was subjected to the following conduct by defendant Scott: Mr. Scott commented on more than one occasion that plaintiff "had a nice ass" and that "he'd like to have a piece of that." Additionally, Mr. Scott touched plaintiff's buttocks on occasion. While Mr. Scott denied these statements and acts, the denials are not clearly credible since other employees testified to seeing such conduct. This conduct did not continue after the filing of plaintiff's first administrative charge.
9. The credible evidence establishes that between 1984 and July 14, 1986, plaintiff was subjected to the following conduct by defendant Besore: On more than one occasion, Mr. Besore would make comments such as "did(n't) you get any last night," "do you spit or swallow," or "you have the whitest teeth I ever came across." The latter two comments were reported to be punch lines from dirty jokes related in the mold department. Plaintiff thought they were references to oral sex acts. Additionally, Mr. Besore would make references to plaintiff's weight, her "big butt" *1491 or her "boobs." During one staff meeting, Mr. Besore responded to plaintiff's inquiry about where she should sit by moving plaintiff's head down while saying something to the effect that she "might as well sit underneath his desk since that's where everybody says you do your best work." On one occasion when plaintiff would not leave his office while he was in a meeting with a salesperson, Mr. Besore said to her something like: "You want to go out with [the salesperson] tonight? ... You want to show him a good time or something?" Mr. Besore explained he was trying to embarrass her into leaving his office rather than reprimanding her in front of the salesperson. Once Mr. Besore touched plaintiff's breasts and plaintiff responded by slapping him. On several occasions, Mr. Besore would tap plaintiff's and other employees' buttocks while remarking to the employees that they should get on with or back to their work.
10. Plaintiff was embarrassed or offended by these acts and comments but did not say anything about them to Mr. Besore, to Mr. Scott, or to any other managerial staff at defendant corporation.
11. Before plaintiff filed the July 16, 1986, administrative charge, plaintiff received at or near her work station:
(a) a sausage with a note "bite me baby" (found in her purse on November 4, 1985);
(b) a clay replica of a penis with steel wool testicles and a semen-like substance on it (found in her workbench on April 16, 1986);
(c) a welded figure of a man with a penis (found on an unknown date);
(d) a pair of women's underwear with a sanitary napkin having a reddish substance on it and with a note attached saying something like "Jackie have you lost this" (found hanging from the light at her workbench in March or April 1986);
(e) a pile of a substance described as "semen-like" (found on her toolbox on June 23, 1986);
(f) a picture of an erect penis (found on her toolbox on July 14, 1986); and
(g) "Playboy-type" pictures (found at her workbench about once or twice a week since 1984).
12. After her first administrative charge was filed on July 16, 1986, plaintiff received the following at or near her work station:
(a) the words "bitch" or "slut" written on her desk (found July 21, 1986);
(b) a large replica of an erect penis apparently made out of a stick and hard glue, along with a note saying: "Hey Jake [sic]  Heard ya got one in your pants the same size. I never knew, think we could get together.  Your Lesbian Friend" (found on her toolbox July 23, 1986);
(c) the words "Jackie blows heads" written on a shelf sign marking where equipment called "blowheads" were kept (found at first on August 7, 1986, and remained for approximately six days);
(d) a picture of a nude woman sitting on the edge of a bathtub and touching her breasts, with a note saying something like "You should be doing this instead of a man's job;"
(e) a cartoon reading "Half ton pickup" with the word "Jackie" written across the chest of the fat woman in the cartoon (found in late August 1986, posted on a bulletin board in the mold department);
(f) a cartoon of five men with handwritten words "Jackie," "suck me asshole," and "full of shit" added to the picture (found on bulletin board near plaintiff's workbench in October 1986);
(g) the words "slut" and "whore" written on a green welding screen (first discovered in October 1986 and remained for approximately one month); and
(h) a sign reading "JackieAttention! Because of the outbreak of A.I.D.S. you are no longer required to kiss the boss's ass" (found in mid-October 1986 on a bulletin board in the mold department).
13. Additionally, plaintiff was subject to the following incidents:
(a) in mid-August 1986, plaintiff discovered the wires to her radio had been cut;
*1492 (b) at the end of August 1986, plaintiff discovered the fan at her work station had been damaged so that it did not function;
(c) in early September 1986, someone had put black grease in her welding helmet;
(d) in early September 1986, her roller cabinet had been "locktighted" which required the breaking and replacement of the cabinet's lock to fix it;
(e) a few days thereafter, plaintiff noticed the cabinet had been dented;
(f) in early October 1986, plaintiff discovered someone had put a substance smelling like urine in the airline she used;
(g) in October 1986, plaintiff discovered on her toolbox a substance that looked to her like phlegm;
(h) on or about November 13, 1986, plaintiff found what she considered to be a semen-like substance on the chair at her workbench;
(i) sometime during November 1986, someone stole plaintiff's tools having an approximate value of $1000 to $1200;
(j) after the tools were taken, on November 24, 1986, plaintiff found a note saying "Mold shop missing tool relief fund & tax deduction (1986 only)" at her work station with a tin can having one cent in it; and
(k) during January 1987, one of her wooden toolboxes was stolen and on one occasion she was unable to stop employees from throwing cartridges (1½" rolled and glued sandpaper) at her.
14. Promptly after each incident, except upon receipt of the stick and glue replica of a penis, plaintiff reported the incident to Mr. Besore and asked that he do something to stop the incidents. While Mr. Besore characterized some of the materials received by plaintiff as "sickening," Mr. Besore did not consider any of the incidents as sexual harassment or as anything more than horseplay and pranks to which a number of mold department employees were subjected. Occasionally, during his weekly staff meetings, he would mention that horseplay would not be tolerated. Once or twice, he mentioned to defendant Scott the existence of conflict among mold department employees. On occasion, he would advise Mick Oldham, Manager of Human Relations at Foster-Forbes, of problems with pranks in the mold department. Mr. Besore does not recall specifically describing to Mr. Scott or to Mr. Oldham the precise nature of the materials received by plaintiff, although he may have done so.
Mr. Besore was not present when plaintiff received the stick and glue replica of a penis. Upon learning of that item, Mr. Besore unsuccessfully asked certain employees if anyone knew who was responsible.
15. While plaintiff reported certain incidents (such as the substance found on her toolbox or a substance in her airline) to Mr. Scott, he was not aware until after receipt of the administrative charge of the sexual nature of some of the materials received by plaintiff. From the end of July 1986 to the date of the administrative hearing in December 1986, no sexual materials received by plaintiff were brought to Mr. Scott's attention by plaintiff or others.
16. Prior to the filing of the administrative charge in July 1986, plaintiff had not notified any supervisory personnel above Mr. Scott of the materials she received.
17. Due to Mr. Besore's absence, plaintiff reported the receipt of the stick and glue replica of a penis to William Barrett, the plant manager. Mr. Barrett intimated that such incidents would stop if plaintiff stopped antagonizing the other employees.
18. Mr. Scott and Mr. Besore usually responded to plaintiff's requests that something be done about the materials by telling plaintiff to clean up the material and/or return to her work. Mr. Besore and Mr. Scott noted the conduct might stop if she didn't let it bother her so much. Additionally, plaintiff was repeatedly advised nothing could be done without knowing who was responsible.
19. No person or persons were ever identified as being responsible for the conduct toward or materials left for plaintiff.
20. Defendants indicated that plaintiff may have antagonized other employees by *1493 visiting Mr. Besore's office frequently, in particular to answer or use the telephone, or by leaving unwanted scriptures at one employee's work station. Additionally, Mr. Besore opined that plaintiff had a tendency to complain a lot. Despite this and other occasional incidents of plaintiff's relatively inappropriate behavior,[1] no one stated that plaintiff invited, instigated, or enticed the receipt of the materials she found or the conduct toward her.
21. After receipt of plaintiff's July 16, 1986, administrative charge, (a) Mr. Oldham asked Mr. Besore and Mr. Scott twice to respond to each of plaintiff's claims; (b) Mr. Besore removed from the plant any magazines from which pictures might be taken; (c) Mr. Oldham met with mold department employees and told them the horseplay and pranks had to stop; (d) Mr. Besore reportedly distributed and posted a memorandum in response to the "AIDS" notice; (e) the union shop committee's aid in discovering who was responsible for the items was solicited; and (f) the installation of a surveillance camera was suggested and rejected.
No managerial staff spoke directly with plaintiff about the basis for the charge.
22. It was not unusual in the mold department to hear dirty jokes or vulgar language; to "goose" other employees; to "grease" employees' chairs, vices, or gloves; to throw objects; to have piles of a substance (variously referred to as "phlegm," a semen-like substance, or "waterless hand cleaner") left at a work area; or to have cartoons referencing various employees posted on the bulletin board. At weekly meetings, management discussed the need to stop this horseplay for safety reasons.
23. From October 1986 to March 1987, plaintiff saw several doctors for "nervousness," "sleeplessness," blotches or welts on her legs and back, and an occasional inability to breath or difficulty breathing. At one doctor's suggestion, she remained away from work for two weeks and her symptoms improved. Two doctors suggested she resign. The company doctor who examined plaintiff prior to her return to work in March 1988 opined that her physical problems were most likely due to "interpersonal conflicts" at the mold department.
24. Plaintiff resigned on March 24, 1987, due to her physical problems; her feeling neither she nor her tools were protected at work; and her feeling no one would do anything to help her.
25. Mr. Scott meets with his supervisors, including Mr. Besore, each morning. Additionally, Mr. Scott makes it a usual practice to tour the mold department on a regular, almost daily basis. After receipt of the July 1986 administrative charge, Mr. Scott asked each of his supervisors, including Mr. Besore, to bring anything to his attention. When he asked Mr. Besore what was going on, Mr. Besore did not mention plaintiff's receipt of sexual materials.
26. No one was aware of any formal or informal company procedure by which an employee could pursue a claim of sexual harassment by co-employees or by supervisory personnel. Defendants intimated that plaintiff was familiar with and could have pursued a union grievance.
27. In April 1986, the other female employee in the mold department quit. At first, she stated she was quitting due to a need to care for her child. The company forms she completed stated she was quitting due to harassment.
28. The week before trial of this case began, there was posted in the men's room at Foster-Forbes a cartoon of a woman lying on her back with her legs spread open. "Jackie" was written on the cartoon.
*1494 29. One female employee reported that Mr. Besore had commented "boys will be boys" in a discussion with the witness about the replicas of the penises that plaintiff had received.
30. In the months just before plaintiff's resignation, plaintiff was not at work many days due to sick leave. Plaintiff was on sick leave from approximately February 18, 1987, to the effective date of her resignation.
31. The parties stipulated that a machinist such as plaintiff would be paid as follows:

 Hourly Rate Effective Date
 $12.47 3/1/87
 12.97 4/1/87
 13.17 7/1/87
 13.42 9/1/88

32. The Court finds it inappropriate to rely on the wages earned (including overtime) by the machinist plaintiff asserts is the next most senior after plaintiff to determine the amount of plaintiff's lost wages. Mr. Oldham, the custodian of the relevant records, opined that a different employee would be more comparable to plaintiff's wages and benefits. Additionally, although the overtime equalization plan gave each machinist in the mold department the same opportunity to obtain overtime, there was no indication of record either that each such machinist actually achieved equal overtime or that plaintiff had discernible amounts of overtime prior to her resignation.
33. Due to trial preparation and attendance, plaintiff lost $108.00 per day for 11½ days in 1988 and 1989 for a total loss of $1,500.00.
34. On September 8, 1987, defendant corporation unconditionally offered plaintiff reinstatement. On December 18, 1987, plaintiff accepted the offer. On March 8, 1988, plaintiff returned to work at Foster-Forbes.
35. As a machinist at Foster-Forbes, plaintiff is a member of the American Flint Glass Workers Union, AFL-CIO, Local 77 ("Flintworkers"). During 1984 through 1987, the collective bargaining agreements between the Flintworkers and defendant corporation provided in relevant part that neither the corporation nor the union would discriminate against any employee "because of race, color, religion, sex, or national origin." Additionally, those agreements contained a grievance procedure which provides that the union's shop committee shall pursue the complaint through various specified steps if it is not resolved in the initial step. By its terms, the grievance procedure appears to allow the grievant alone to pursue the matter only through the first step.
36. During the relevant time, the defendant corporation did not have an express policy against sexual harassment or a grievance procedure independent of the policy and procedure in the collective bargaining agreements.

Conclusions of Law
A. Jurisdiction and venue are proper in this Court. 28 U.S.C. §§ 1331, 1343(4), 1391(b); 42 U.S.C. § 2000e-5(f)(3).
B. For the most part, this case turns upon the witnesses' credibility. In making the necessary credibility determinations, the Court considered the relationship of the witnesses to the parties, the witnesses' interest in the outcome of these proceedings, the witnesses' demeanor while testifying, the witnesses' opportunity to observe and acquire knowledge of what they were testifying about, and the extent to which the testimony was supported or contradicted by other credible evidence. Perkins v. General Motors Corp., 709 F.Supp. 1487, 1499 (W.D.Mo.1989).
C. 42 U.S.C. § 2000e-2(a)(1) provides in relevant part that "[i]t shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to ... compensation, terms, conditions, or privileges of employment, because of such individual's ... sex."
D. If sexual harassment is sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment, then a violation of Title VII's proscription against sex discrimination has occurred. Meritor Savings *1495 Bank v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986); Minteer v. Auger, 844 F.2d 569, 570 (8th Cir.1988). Such harassment occurs when an employer's "`conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.'" Vinson, 477 U.S. at 65, 106 S.Ct. at 2404 (quoting 29 C.F.R. § 1604.11(a) (1985)); Hall v. Gus Constr. Co., 842 F.2d 1010, 1013 (8th Cir.1988). To prevail on a hostile environment sexual harassment claim, plaintiff must establish:
(1) [plaintiff] belongs to a protected group, (2) [plaintiff] was subject to unwelcome sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a "term, condition, or privilege" of employment, and (5) the employer knew or should have known of the harassment in question and failed to take proper remedial action.
Moylan v. Maries County, 792 F.2d 746, 750 (8th Cir.1986) (citing Henson v. City of Dundee, 682 F.2d 897, 903-05 (11th Cir. 1982)).
Here, the parties do not dispute that, as a woman, plaintiff falls within a protected group. The parties dispute each of the other required elements.
E. The Court finds plaintiff was the subject of unwelcome sexual harassment from 1984 through her resignation in March 1987. To be unwelcome, the employee must not "solicit or invite it, and the [complaining] employee [must] regard[] the conduct as undesirable or offensive." Moylan, 792 F.2d at 749. While the nature of the work environment might be appropriate to consider, see Hall, 842 F.2d at 1017-18; Perkins, 709 F.Supp. at 1499, a ribald work environment should not excuse nor endorse sexually harassing conduct, Hall, 842 F.2d at 1017-18. Indeed, evidence of conduct toward those other than plaintiff may serve to establish the hostility of the environment. Hall, 842 F.2d at 1015. Accordingly, the environment in and of itself does not render harassing conduct "welcome."
The plaintiff's own behavior may, however, be indicative of whether or not the challenged conduct is "unwelcome." Vinson, 477 U.S. at 69, 106 S.Ct. at 2406 ("a complainant's sexually provocative speech or dress [is relevant] in determining whether he or she found particular sexual advances unwelcome"); Jones v. Wesco Investments, Inc., 846 F.2d 1154, 1155 n. 4 (8th Cir.1988). Here, there is no contention that plaintiff's manner of dress was sexually provocative. Rather, defendants rely on plaintiff's purported use of profane language; plaintiff's frequent use of a supervisor's office; and plaintiff's distribution of religious-oriented materials and statements as provoking the challenged conduct at issue here. While the Court cannot condone plaintiff's conduct in the workplace, the Court does not find such conduct sufficiently provocative of the materials and comments plaintiff endured. Plaintiff's use of profane language and the greasing of other employees' equipment could be part of plaintiff's efforts to fit in to the environment at hand. Such conduct, however, does not justify the harassing conduct plaintiff then endured. Importantly, no witnesses opined there was a relationship between what plaintiff did and the materials she received.
Finally, plaintiff expressed distaste for the items and materials she received, and expressed embarrassment at the language she endured from defendant Besore.
Accordingly, the Court finds the challenged conduct toward plaintiff and the materials plaintiff received were "unwelcome."
F. This Court also determines that the harassing conduct and materials were based on sex. Defendants here point out that some of the materials received by plaintiff and some of the conduct directed toward plaintiff were not sexual in nature. This, however, does not make the conduct irrelevant to the inquiry. So long as the Court finds "the incidents of harassment and unequal treatment ... would not have occurred but for the fact" plaintiff was a woman, the Court may properly consider *1496 them in its analysis. Hall, 842 F.2d at 1014.
Here, the most offending conduct is clearly sexual in nature. The welded man with an erect penis, the handmade models of penises, and the magazine pictures of a nude woman and of a penis, among other things, clearly have sexual overtones. The "slut," "did you get any last night," and "Jackie blows heads" references are clearly sexual in nature. The broken fans, radios, stolen tools, vandalized toolboxes, and the like, more likely than not were generated by the same animus that generated the note, "This is what you should be doing instead of a man's job." Defendants have not suggested that any male employee was subjected to a campaign of harassment comparable to that of plaintiff. The totality of the circumstances in the workplace, the pattern of harassment to which plaintiff was subjected, and its relatedness to the overtly sexual conduct, all indicate that the so-called non-sexual harassment more likely than not was due to plaintiff's sex. Thus, plaintiff has met the third element of the inquiry.
G. Furthermore, the harassment affected "a term, condition or privilege" of employment. In his report, the doctor selected by defendant corporation opined that plaintiff's allergic reactions, reactions acquired from 1985 and later years, were more probably due to interpersonal relationships at work than a reaction to a physical exposure to chemicals and other substances at the workplace. She became so ill that she ultimately left her employment. Thus, the conduct by Besore and others was consistent enough and pervasive enough to alter the conditions of plaintiff's employment.
The Court does not find, however, that defendant Scott's challenged conduct was sufficiently pervasive or severe to constitute actionable conduct.
H. Plaintiff has provided credible evidence of a sexually hostile environment by co-workers and defendant Besore at Foster-Forbes, Pevely, Missouri, between 1984 and March 1987. Plaintiff has established that she consistently advised her supervisor, Glenn Besore, about many individual incidents. While defendants urge plaintiff should have done more, it is not clear there was more she should do. The only grievance procedure available to her was in the relevant collective bargaining agreements, and that procedure does not clearly allow an individual employee to go beyond the first step without support of the local union shop committee. Moreover, neither the policy statement in the relevant collective bargaining agreements nor any other policy statement of defendant corporation expressly prohibited sexual harassment. The fact that Mr. Besore was incapable of communicating or unable to communicate to other supervisory personnel the actual nature of the materials and incidents should not excuse the employer's inattention to such materials and incidents.
I. Neither defendant corporation nor defendant Besore took remedial actions which were reasonably calculated to be effective in ending the harassment. See Ways v. City of Lincoln, 871 F.2d 750, 755 (8th Cir.1989) (district court finding that employer's efforts were "not impressively effective" in ridding workplace of racially hostile language and incidents was not clearly erroneous). Those defendants unreasonably relied on plaintiff's co-workers to police themselves, although some among them were the most likely culprits. Those defendants failed to interview plaintiff about the harassment. Those defendants apparently expected that occasional, mild rebukes of employees about "horseplay" and "pranks" would put a stop to what, in fact and law, was serious sexual harassment. It was particularly unreasonable for defendant corporation to leave Mr. Besore in a supervisory position over the mold department when he himself had engaged in sexually harassing conduct, and his efforts to stop the harassment of plaintiff were not effective over the course of two and one-half years. Most significantly, defendants' efforts were never completely effective in putting an end to the harassment of plaintiff.
J. The corporate defendant and defendant Besore are liable to plaintiff for both *1497 the conditions plaintiff experienced at work and for constructive discharge. Plaintiff has shown that the harassment directed at her continued up to within a few weeks of the date she went on sick leave. The conclusions of corporate defendant's doctor support plaintiff's contention that the stress and tension she experienced at work because of the harassment and the threat of harassment were the source of her health problems. Although the harassment plaintiff experienced in the weeks just prior to her sick leave may not have been overtly sexual, it was part of a continuing campaign of clearly sexual harassment which dated back at least two and one-half years, and which was directed at her because she is a female. Plaintiff has proven that she was subjected to unlawful sexual harassment which defendants' ineffectual measures failed to curtail. Under these circumstances, the Court is left with the impression that defendant corporation and defendant Besore were at best indifferent to plaintiff's situation, and at worst intended to let it run its course with the foreseeable possibility that plaintiff would eventually resign. A reasonable person would have found the conditions intolerable, particularly when they did not abate within a reasonable time after the defendant corporation received the administrative charge. Thus, the Court finds defendant corporation's and defendant Besore's conduct was deliberate, see Taylor v. Jones, 653 F.2d 1193, 1199 (8th Cir.1981) (on constructive discharge claim, employer liable for black employee's resignation due to racial atmosphere resulting from employer's deliberate acts), or "intentional," see Craft v. Metro-Media, Inc., 766 F.2d 1205, 1217 (8th Cir.1985) (on constructive discharge claim, employer must be found to have taken actions with intent to force employee to quit), cert. denied, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986), for purposes of plaintiff's constructive discharge claim.
K. Plaintiff's entitlement to a full measure of relief includes, but is not limited to, a seniority date retroactive to her initial date of hire, "back pay from the date of discharge ... and any increases she would have received within that period ... [and] any fringe benefits she would have received," Paxton v. Union National Bank of Little Rock, 688 F.2d 552, 547 (8th Cir.1982), cert. denied, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983), prejudgment interest, Washington v. Kroger Co., 671 F.2d 1072, 1078 (8th Cir.1982), and appropriate injunctive relief.
L. Plaintiff is entitled to receive backpay from the effective date of her resignation (March 30, 1987) until the defendants' unconditional offer of re-employment made on September 8, 1987. Ford v. EEOC, 102 S.Ct. 3057, 73 L.Ed.2d 721 458 U.S. 219 (1982). Thus, plaintiff is entitled to the following amount in backpay:

$ 199.52 ($12.47/hr. × 8 hrs. = $99.76 × 2 days for
 3/30/87 and 3/31/87)
 311.28 ($12.97/hr. × 8 hrs = $103.76 × 3 days for
 4/1/87, 4/2/87, and 4/3/87)
 6,225.60 ($12.97/hr. × 40 hours per week = $518.80 ×
 12 weeks for 4/6/87 through 6/26/87)
 207.52 ($12.97/hr. × 8 hrs. = $103.76 × 2 days for
 6/29/87 and 6/30/87)
 5,268.00 ($13.17/hr. × 40 hours per week = $526.80 ×
 10 weeks for 7/1/87 through 9/8/87)
__________
$12,211.92

M. Plaintiff is also entitled to an amount of prejudgment interest on the backpay awarded. The Court finds a nine percent annual interest rate reasonable and proper. Thus, the Court awards plaintiff:

$ 2,198.14 ($12,211.92 × .09 interest rate = $1,099.07 × 2
 years for 9/8/87 through 9/8/89)
 274.74 ($1,099.07 divided by 12 months/year = $91.58
 × 3 for (9/8/89 through 12/8/89)
 30.01 ($1,099.07 divided by 365 days/year = $3.01 ×
 10 for 12/8/89 through 12/18/89)
__________
$ 2,502.98

N. Plaintiff will also be compensated for the 11.5 days of work she missed for pretrial preparation and trial, or a total of $1,500.00. Since there was no proof of which days were missed, the Court will not award prejudgment interest on this amount.
O. Plaintiff is also entitled to seniority retroactive to the initial date of hire in 1981.
P. Since there was no proof of vacation to which plaintiff would otherwise be entitled and no proof of the value of any such vacation benefit, the Court will not award plaintiff any vacation-related relief.
*1498 Q. Additionally, defendant corporation shall (a) develop a staff training program; and (b) establish a grievance procedure for sexual harassment occurring in the workplace. The grievance procedure shall be posted or otherwise publicized and shall apply to all employees. Within thirty days of the date of this order, the proposed training program, grievance procedure, and method(s) for publicizing the grievance procedure shall be submitted to the Court and served on plaintiff. Within fifteen days thereafter, plaintiff shall file any response(s) she may have to defendant corporation's proposals.
R. On or before December 26, 1989, plaintiff's attorney shall file a documented request for attorney's fees and expenses, along with a brief (no more than fifteen pages in length) citing argument and authority in support of the request. On or before January 5, 1990, defendants may respond to plaintiff's documentation and brief filed in support of plaintiff's request for fees and expenses.

JUDGMENT
A memorandum dated this day is hereby incorporated into and made a part of this judgment.
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that plaintiff Jacquelyn L. Morris take nothing by her cause of action against defendant David Scott and the same is dismissed with prejudice at plaintiff's costs.
IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiff Jacquelyn L. Morris recover of defendants American National Can Corporation and Glenn Besore, jointly and severally, a total of $16,214.90 ($12,211.92 in backpay; $2,502.98 in prejudgment interest on the backpay; plus $1,500.00 for eleven and one-half days for pretrial preparation and trial), post-judgment interest thereon at the legal rate, attorney's fees, and costs.
IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that plaintiff Jacquelyn L. Morris shall be awarded seniority retroactive to the initial date of hire in 1981.
IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that defendant American National Can Corporation develop a staff training program and a grievance procedure to address sexual harassment in the workplace. The grievance procedure shall be posted or otherwise publicized and shall apply to all employees.
IT IS HEREBY FURTHER ORDERED that within thirty days of the date of this order, the proposed training program, grievance procedure, and method(s) for publicizing the grievance procedure shall be submitted to the Court and served on plaintiff. Within fifteen days thereafter, plaintiff shall file any response(s) she may have to defendant corporation's proposals.
IT IS HEREBY FURTHER ORDERED that on or before December 28, 1989, plaintiff's counsel shall file a documented request for attorney's fees and expenses, along with a brief (no more than fifteen pages in length) citing argument and authority in support of the request.
IT IS HEREBY FURTHER ORDERED that on or before January 8, 1990, defendants may respond to plaintiff's documentation and brief filed in support of plaintiff's request for fees and expenses.
NOTES
[1] Plaintiff called Mr. Besore a "fuzzball." She stated she was referring to a "curly perm" he had. Mr. Besore didn't know whether she was referring to that or to his alleged inability to deal with other employees in a manner plaintiff reportedly deemed appropriate. Once during an argument, plaintiff referred to another male employee as "dick breath." That nickname has stuck with that employee despite his disapproval of it. On occasion, plaintiff greased other employees' equipment.